PEOPLE *v.* COLLINS.

1. CRIMINAL LAW—VOLUNTARY CONFESSIONS—ADMISSIBILITY.

Statement of defendant, charged with first degree murder, was admissible where he was an attorney himself and declared he was willing to make the statement voluntarily although the act of the police officers in permitting him to have a small drink of whiskey shortly before making the statement merits condemnation even though it had no intoxicating effect on him.

2. SAME—EVIDENCE OF GUILT.

In a prosecution for a crime, the people are required to prove guilt of the defendant beyond a reasonable doubt rather than by the great weight of the evidence.

3. HOMICIDE—EVIDENCE—SECOND DEGREE MURDER.

On appeal from denial of new trial after conviction of second degree murder on ground that verdict was against the great weight of the evidence, such denial was not error where there was testimony which justified a verdict of guilty of second degree murder beyond a reasonable doubt.

4. CRIMINAL LAW—CREDIBILITY OF WITNESSES.

Credibility of witnesses is a matter for the jury to determine in a criminal prosecution.

5. HOMICIDE—MURDER—MANSLAUGHTER—EVIDENCE—INTENT.

Record, including defendant's own testimony and admissions, in prosecution for murder justified court in submitting to jury the question of whether the killing was wilful, deliberate, premeditated, and malicious; hence court was not in error in refusing to submit case to jury solely as a charge of manslaughter.

6. SAME—INTENT—MURDER—MANSLAUGHTER.

In determining whether a person who has killed another without meaning to kill him is guilty of murder or manslaughter, the nature and extent of the injury or wrong which was actually intended must usually be of controlling importance.

7. SAME—INTENT—MURDER.

While it is not always necessary that one held for murder must have intended to take the life of the person he slays by his wrongful act or that he must have intended a personal injury to such person, it is necessary that the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life.

8. SAME—MURDER—MANSLAUGHTER—EVIDENCE—QUESTION FOR JURY.

In prosecution for murder, evidence showing that defendant thought that deceased had insulted defendant's lady friend, that defendant meditated an assault, stepped from deceased's car and struck him two blows which knocked him down, then stomped on the helpless victim's head, neck and shoulders, and that death resulted from the stomping, afforded a possibility that jury might find defendant guilty of murder in the first degree, and since it was the province of the jury, not the court, to decide whether there was much or little testimony reducing crime from murder to manslaughter it was not error for court to submit to jury whether defendant was guilty of murder or manslaughter.

9. SAME—MURDER—INSTRUCTIONS.

In prosecution for murder claimed to have been effected by defendant stomping on his victim after knocking him down, various references in court's charge to jury to defendant's "kicking" or "stomping" on victim did not constitute error.

10. SAME—CAUSE OF DEATH—QUESTION FOR JURY.

In prosecution for murder wherein it is admitted defendant knocked victim down, cause of death was a question of fact for jury where prosecution claims it resulted from defendant's subsequent stomping on victim's head, neck and shoulders and defendant who claims to have struck in self-defense asserted victim fell against car as he went down.

11. CRIMINAL LAW—ASSAULT—AGGRESSOR.

After defendant who claims to have knocked another down in self-defense continued to assault such other who was then lying on the sidewalk, defendant was then the aggressor and not acting in self-defense.

12. SAME—INSTRUCTIONS—REQUESTS TO CHARGE.

Failure to follow wording of defendant's requests to charge does not constitute error where court uses his own phraseology and sufficiently instructs jury as to the law in a criminal prosecution.

13. SAME—INSTRUCTIONS—PRESUMPTION OF INNOCENCE.

In prosecution for murder, instruction that a man is presumed innocent of crime with which he was charged until such presumption is overcome by evidence that convinces jury of guilt beyond a reasonable doubt and that such presumption applies to every element of the offense which is necessary to be established in order to convict was proper.

14. SAME—INSTRUCTIONS—MURDER—INTOXICATION—INTENT.

In prosecution for murder wherein instruction that while voluntary intoxication on part of defendant is not a defense to crime, yet if defendant were so deeply intoxicated as to be incapable of forming in his mind a design deliberately and premeditatedly to do the killing then defendant could only be convicted of murder in the second degree or manslaughter was proper where evidence showed defendant was at least somewhat intoxicated at time homicide took place.

Appeal from Jackson; Simpson (John), J. Submitted June 12, 1942. (Docket No. 65, Calendar No. 41,899.) Decided September 8, 1942. Rehearing denied October 21, 1942. Reconsideration denied November 25, 1942.

John F. Collins, Jr., was convicted of second degree murder. Affirmed.

*Harry D. Boardman* and *Thomas F. Chawke,* for appellant.

*Herbert J. Rushton,* Attorney General, and *Ernest J. Rogers,* Prosecuting Attorney, for the people.

BOYLES, J. Defendant was tried by jury in Jackson county on an information charging murder of the first degree, with count for manslaughter, committed against one Elmer Parker. For reversal, defendant claims that the verdict was against the great weight of the evidence, and that the court was in error in his charge to the jury in several particulars.

The defendant, about 8 o'clock in the evening of April 18, 1941, met in the vicinity of the Hayes hotel in the city of Jackson a Miss Kearney with whom he had been keeping company. During the day he had consumed a considerable quantity of intoxicating liquor and was then somewhat intoxicated. The two proceeded to a restaurant in Jackson where they remained until about 10 o'clock and from there went to a tavern where they both drank beer. While there, both of them had occasion to leave the table at which they were seated and when they returned they found seated there one Elmer Parker and his lady companion, both of whom were previously unknown to them. Parker apologized and prevailed upon them to sit down, and thereafter they all talked together and drank more beer. Somewhere around 1 o'clock in the morning they all went outside the tavern and while defendant and his companion were waiting for a taxicab to arrive, Parker offered to take them anywhere in his automobile; there was some discussion about defendant and his companion desiring to go home; they all got into Parker's car and proceeded to defendant's home but the defendant and his companion did not stop there; someone suggested that they go to a certain other tavern which they proceeded to do. They remained there for some time drinking more beer, the defendant, however, insisting he didn't need any more. While there, some confusion arose about paying for the beer. The men were slow about paying so Miss Kearney took a dollar bill from her purse and placed it on the table. Parker also laid a dollar bill on the table. The waitress took one of the bills, made change and in some way the other dollar bill fell to the floor, the waitress picked it up, Parker took it and put it in his pocket. They all left this tavern in Parker's car about 2 o'clock in

the morning. Parker's companion drove, Parker sat at her right in the front seat, the defendant was seated behind him in the back seat, and defendant's companion, Miss Kearney, was seated behind the driver. Someone suggested they go to the Regent restaurant and while on the way there, defendant (according to his own testimony) discovered Parker trying to feel Miss Kearney's legs, reached over and pushed Parker's hand away and said "Just what is the trouble? What is the matter with you? Are you crazy?" It appears that about that time Parker handed Miss Kearney the dollar bill that had previously been picked up by him; that the defendant said to Miss Kearney "That man has insulted you," and she said "Now, never mind. He has not." Defendant testified that during the rest of the time until they got downtown, he and Miss Kearney were arguing about whether Parker had insulted her. The party finally arrived in front of the post-office in the city of Jackson, on the opposite side of the street from the Regent restaurant. The car was there parked parallel with the curb. Parker and his companion went into the restaurant, leaving the defendant and Miss Kearney seated in the rear seat of Parker's car. Looking out the window of the restaurant, Parker's companion saw the defendant get out of the car once and testified that defendant was in his shirtsleeves, with his coat off. Shortly afterward Parker left his companion in the restaurant, walked across the street to his automobile in which the defendant and his companion were then seated. Exactly what occurred next is in dispute. The defendant testified that Parker pulled open the door of the car, grabbed at defendant's ankle, and that: .

"When he did that, I withdrew my ankle from him and I took my topcoat in the right hand and I

started to get out of the car. As I started out the door, Mr. Parker partly withdrew from the door. He moved, it seemed to me, toward the front of the car but not far. Then when I got both feet on the sidewalk, I stood there and looked at him, and he mumbled something more and then lifted his arm like this (indicating) high, like with his clenched fist, and I realized he was about to deliver a blow, and I, in self-defense, hit him with my left hand, and it seems to me that I threw my topcoat away with my right hand, and then I hit him in the face with my right hand. I hit him with my left hand in the body some place, and in the face. I hit him in the front of the body, he was facing me at all times.

"I did not see him fall down. The next thing I remembered—I was shocked and surprised. There he lay before me, very close to me, and my—I am sure when I saw him he was lying there face upwards, and I thought: Well, I do not believe he is knocked out. I believe he is just shamming."

Parker's companion, still seated in the restaurant across the street, did not see what happened. Miss Kearney, who was still seated in the rear seat of the car, testified to what happened as follows:

"The next I saw him (Parker) was when he appeared outside of the automobile on Mr. Collins' side. The car door was not open at that time. I said something to Mr. Collins to the effect that I supposed he was satisfied now Mr. Parker was back. We had been trying to get away from him all evening, and we didn't go when we had the opportunity. We couldn't decide how to go home. And then I turned to pick up my gloves and purse, and by that time Mr. Collins was out of the car. Whether he opened the door and got out, I don't know. I was still in the car when I turned to pick up my gloves. I couldn't find my gloves. I found my purse and a bag I had with me, and I got out of the car. There were some groceries in the back of the car that had

been spilled. I believe there were eggs in there that had been broken, and it seemed to me the men were having some discussion, but I am not sure of that and I don't know a word they said, but I sensed a quarrelsome atmosphere among them, and I thought I would call attention to those groceries and maybe they would forget what they had been talking about. After I mentioned about the groceries, I apologized and told Mr. Parker we would be glad to replace them for him, and he didn't seem to have much to say. He didn't seem to like the idea of it, that the things had been spoiled or destroyed, and so I reached in the car again to look for my gloves. Neither of the men made any effort to find them. I said I hadn't found my gloves yet, and Mr. Parker put his hand up.

"*Q.* Yes.

"*A.* I don't know why, but I supposed—

"*Mr. Chawke:* Just a minute. I object to what the witness supposed.

"*The Witness:* His hand went up like that (indicating). Up in the air. He was standing there very close to the car. I don't know where the light switch was. The next time I looked out Mr. Collins was removing his coat. I don't know for certain what he did with it. I know that it came off his right arm first. Whether he even got his coat off his left arm or not, I don't know. Mr. Collins was between me and Mr. Parker, and I don't know what Mr. Parker was doing at that time. I couldn't really see Mr. Parker. When Mr. Collins started to remove his coat, I thought that was a gesture of fight, and I said 'Don't fight,' and I grabbed him by the suspenders. I did not see any blows struck. While I had hold of his suspenders, I felt a tugging. I was holding his suspenders and I could feel a motion, it seemed to me a swaying of his shoulders. That seemed to be only a matter of seconds that all was taking place, and I told Mr. Collins that if he was going to fight I was going to leave him there, and he

said, 'Oh, all right. I am going,' or 'I will go,' and he walked away very rapidly and I watched him go. I believe he went northwest, that would be toward Francis street.

"*Q.* Now, during the time that you felt this swaying of Mr. Collins' shoulders, what was Mr. Parker doing?

"*A.* I couldn't see Mr. Parker.

"*Q.* You could not see Mr. Parker?

"*A.* I was behind Mr. Collins and that obstructed my view."

Miss Kearney testified she then turned and walked away and when she reached the postoffice:

"I turned around, and that is when I saw Mr. Parker. I couldn't have been more than a few feet away. I can't be sure what position Mr. Parker was in; I was crying and that blurred my vision somewhat. He was lying on the sidewalk. I couldn't say if his face was up, I just saw the form there."

Neither the defendant nor his companion testified as to what, if anything, happened to Parker while he lay on the sidewalk. However, there were two disinterested witnesses who testified to what they saw. Margaret Gibbons, a registered nurse, and a friend, Mrs. Christman, were on their way home in the latter's automobile just before the above occurred and decided to stop at the Regent for a lunch. When they arrived at a point opposite the entrance to the Regent, Mrs. Christman driving, they parked their car immediately behind the Parker car. Margaret Gibbons was sworn and testified:

"When we arrived at a point opposite the entrance of the Regent restaurant, we drove into a parking space. There was only one available space, and we got that. There was a car immediately ahead of where I parked. When the car was driven in this parking space I saw a man and a girl stand-

ing there. The man is tall, slightly bald. He had a white shirt on. All I saw, remember seeing, was his arm mostly, because the girl was tugging at his shoulder or his arm or something, some part of him. I first saw this man and the girl as we started to drive into the parking space. I could not see very well. I saw that. The car lights shone on the man and woman. The man was standing, facing us or facing toward the south, and the girl was standing at his right shoulder sort of back of him, pulling at either his arm or his shoulder or some part of him. I said something to my companion.

"I don't believe we even shut the motor off. We did not observe this couple very long. The girl pulled at his arm, and he gave her a push back, and she sort of lost her balance a little and sort of went back to the bushes, the hedge, around the postoffice. I did not observe the body or figure of a man on the sidewalk at that time. The man sort of pushed the girl away from him. Then the man went over the hedge and got his coat which seemed to be over the hedge on the postoffice lawn. After he shoved the girl we saw the body, probably saw the body at the same time. Probably saw the whole thing at once. The man was standing there.

"*Q.* How close was he standing to the body?

"*A.* The man was lying—the man was lying with his feet toward the car and his head out toward the middle of the sidewalk, and the fellow and the girl were standing in the middle of the sidewalk, also.

"*Q.* Who was the closest to the man that was lying there on the sidewalk?

"*A.* The man.

"*Q.* Did you see anyone stamping there that night? * * *

"*A.* He did something with his feet.

"*Mr. Rogers:* Well, now, can you describe to the jury what he did with his feet?

"*A.* Not exactly, no. I was under the impression that he was stamping. * * *

"*Mr. Rogers:* Now, where was this man standing at the time that you noticed this?

"*A.* In the middle of the sidewalk, probably at the top of the man's body. The man was lying there with his head toward the middle of the sidewalk, and the man was standing toward the middle of the sidewalk. I couldn't see exactly. I don't know how far he was from the man, I was mostly interested in the girl.

"After the man went over and picked up his coat he said something to the girl and walked away, toward Michigan avenue."

Her companion, Mrs. Christman, testified:

"When we got down to the Regent I was driving, and I parked directly across from the entrance. I had no trouble, just drove into a space and stopped. That was on Otsego street, at the left of the post-office lawn, on Otsego. As I was driving in I saw there were some people standing on the sidewalk. I had my lights on dim, and the dim lights throw to the curbing, and as I drove in I saw a man and woman standing there, and I thought they were quarreling.

"*Q.* Now, Mrs. Christman, in your own words tell the jury just what you saw. * * *

"*A.* There were two people standing on the sidewalk and they were quarreling. Why can't I say I thought they were? I don't know what they were doing.

"*The Court:* That is one of the peculiarities of the law. Just go ahead and tell what you saw, Mrs. Christman.

"*A.* They were struggling a little bit.

"*The Court:* That is all right. That answers the purpose.

"*Mr. Rogers:* Now, go ahead.

"*A.* And from where I sat, my car was parked at that time, and from where I sat it looked to me

as though the man was stomping on something. There was a man on the sidewalk.   *   *   *

"*Q.* Where was this you saw this man?

"*A.* He was lying face down on the sidewalk. His head was out in the middle of the sidewalk, toward the middle of the sidewalk, toward the grass, a little northeast of the curbing. This man was standing by the shoulders of the man on the sidewalk, and from where I sat he looked to me as though he were stomping on the shoulders of the man on the sidewalk. I can't tell you in feet how far away I was from where this was occurring. I drove my car into that space leaving adequate space for me to drive out if when I came back the car ahead of me was still there. I didn't observe in feet how far. I left plenty of room for a car to come in behind me and still not crowd my car. Then the man standing there threw his left arm back, shoving the girl away from him, and she staggered into the bushes behind her. Then he stomped again and hurried over to the bushes and leaned over and picked up a coat and threw it over his shoulders, put it on and hurried up west on Otsego. He walked west toward Francis street, hurrying."

On cross-examination, Mrs. Christman testified:

"*Q.* Now, you said in response to Mr. Rogers' question—he asked you this—you used the wording you saw the man stomp. Is that correct?

"*A.* I said, 'from where I sat in my car, he looked to me as though he were stomping on this man's shoulders at the back of his neck.'

"*Q.* Do you know whether he was or not?

"*A.* I know what I saw.   *   *   *

"*Q.* Well, you say, Mrs. Christman, that 'It looked to me,' or 'It seemed.' Now, did he or did he not stomp on the man's shoulders?

"*A.* Yes, he stomped.

"*Q.* Did he stomp on this man's shoulders?

"*A.*   He stomped on the back of his head.

"*Q.*   In your direct examination, didn't you say that he stomped on his shoulder?

"*A.*   I said, 'He stomped on his shoulder and the base of his head, on his neck.'

"*Q.*   That is what you say you saw. there?

"*A.*   Yes, sir.   *   *   *

"*Q.*   Now, you have definitely said here, Mrs. Christman, that you saw this man standing there stomping with his feet.

"*The Witness:* From where I sat, it looked to me as though he were stomping on his shoulders and the back of his neck. I don't mean out here (indicating). I mean in the middle of his back. From where I saw in my car it looked like that to me. That is all I saw of that, and that is all that happened in that respect."

No one questions but that this testimony had reference to the defendant and his companion, and Mr. Parker. These two women then ran to the police station nearby and an ambulance was called. The defendant ran down the street and either ran into or was hit by another automobile, rolled over, got up, refused the assistance offered by the driver, and hurried on down the street. He was apprehended at his home later the same morning. In the meantime, Parker died in the ambulance on the way to the hospital. On post mortem examination, the autopsy disclosed that death was caused by a traumatic hemorrhage at the base of the brain, an injury due to a blow. There was a bruise or contusion under the scalp and over the medulla oblongata—definitely a vital part of the brain. Except for superficial abrasions or bruises on Parker's face, there were no other indications of injury.

In a statement taken at the police headquarters after his arrest, the defendant admitted most of the circumstances leading up to the occurrence which

resulted in Parker's death, admitted being in Parker's car across the street from the Regent restaurant on the occasion in question, and made the following statements:

"*Q.* Did you go in the Regent?

"*A.* No, we stayed in the car.

"*Q.* Why didn't you go in with them?

"*A.* I objected to certain remarks he had made to my girl. They were most objectionable.

"*Q.* What happened then?

"*A.* He came out again and tried to get me to go in the Regent. If I had been sober I would have slapped him and walked away. He stayed there and argued and all at once I gave him a one-two, a left to the solar plexus and a right to the jaw and he went down. I was surprised when he did. I can't punch.

"*Q.* Did you have your coat off?

"*A.* I don't remember taking my coat off.

"*Q.* Did you kick him?

"*A.* I don't know if I did or not. If I did I am ashamed.

"*Q.* What did you do then?

"*A.* Then I went away and had one shoe off. I went on home and knew you were looking for me. * * *

"*Q.* You say this man insulted your girl?

"*A.* He made very insulting remarks.

"*Q.* Did he hit you or attempt to hit you at any time?

"*A.* No.

"*Q.* He didn't hit you?

"*A.* No.

"*Q.* Did you help him up?

"*A.* No. * * *

"*A.* I remember going down as far as Clinton. I saw the lights of the police cars looking for me and I stayed in the woods until they quit trying to get me.

"*Q.* What woods, at the rear of your house?

"*A.* Yes.

"*Q.* How long did you stay there?

"*A.* After I saw no more lights I went in the house and went to bed.

"*Q.* What time was this?               .

"*A.* Before dawn.

"*Q.* Have you been at home ever since?

"*A.* Yes. You were lucky you got in because I just figure it was one of those things. You wouldn't have got in if I had been up.

"*Q.* Did you have anything against this fellow?

"*A.* I never saw him before. It was done without malice. I don't understand my hitting him. Rogers tried to get me once before and didn't do so good, so let's go. A very fine, gallant girl was involved, however, so let's go and get it over with. I remember remarks and expressions. You feel things sometimes, that things are not right. I resented his implications and that's why I didn't go to the Regent. I had the impression that he was insulting me and I resented it. I remember very keenly.

"*Q.* Just what were the remarks?

"*A.* I don't just remember but they were objectionable. I remember the gestures he made. He tried to make me think I was one of those push arounds. You take your chances or die.

"*Q.* He did not fight you?

"*A.* No, but he was very insulting. I just remember that we got down to cases and I gave him the bing, bing, and that's all.

"*Q.* Was Mary in the car all of the time?

"*A.* Yes, shocked.

"*Q.* He came out to get you to go into the Regent?

"*A.* Yes, but he was going to make me go. He looked me right in the eye. He ordered me to come in.

"*Q.* Don't you remember kicking him?

"*A.* No. He was trying to make my gal and I am crazy about her. You would resent it, too.

"*Q.* Was that your motive for striking him?

"*A.* Yes, jealousy, that's all.

"*Q.* You have made this statement of your own free will and no one has forced you to tell your story?

"*A.* That's right, Chief.

"*Q.* How long was this trouble brewing between you?

"*A.* Well, to tell the truth, I am sure I resented it from Tom's Tap. I resented it and that is my motive for hitting him.

"*Q.* How long have you been going with Mary Kearney?

"*A.* For about seven months. She never should have known me as she is a nice girl and too nice for me.

"*Q.* Which side of the car were you sitting when Elmer came out?

"*A.* On the right side of the car.

"*Q.* Which side did he come up on?

"*A.* On the same side.

"*Q.* Did he open the door of the car or did you?

"*A.* I did. I got out and we went at it.

"*Q.* Is this the shoe you wore home last night? (Shown right shoe).

"*A.* Yes.

"*Q.* Is this your shoe, the mate to the one you wore home? (Shown left shoe).

"*A.* Yes, I guess it is.

"*Q.* This is your pair of shoes, then?

"*A.* Yes.

"*Q.* The whole thing was founded on jealousy, then?

"*A.* Yes, I was willing to die for her right there. In fact to save her I would take what the prosecutor has to offer.

"*Q.* You say you hit him with your left hand and then your right hand?

"*A.*   Yes, bing, bing, a left to the solar plexus and a right to the jaw.

"*Q.*   Do you remember Mary trying to stop you?

"*A.*   Yes, I do remember that.   I said I have taken all I am going to take and I let him have it. Too many times I have not connected in time.   I have taken many a beating."

While counsel makes no claim that this statement was not voluntarily made, the proofs show that at the time of his arrest defendant was permitted to have a small drink of whiskey at his home.   The act of the officers in permitting this merits condemnation.   However, the testimony is clear that this had no intoxicating effect on the defendant.   At the police station defendant was warned of his rights— he was an attorney himself and declared he was willing to make a voluntary statement.   The statement was admissible.

Defendant asks for his discharge, or, in the alternative, a new trial on the ground that the verdict was against the great weight of the evidence.   The legal ground for reversal would be, of course, that the people had failed to prove guilt beyond a reasonable doubt, rather than a question of great weight of the evidence.   After verdict, the defendant moved for new trial on the ground, among others, that the verdict was against the great weight of the evidence. Denial of the motion on that ground was not error. Credibility of witnesses is a matter for the jury to determine.   We have quoted the testimony at some length and it shows that there was testimony to justify the verdict of guilty of second degree murder beyond a reasonable doubt.

Defendant claims the court erred in failing to take from the consideration of the jury the charges of murder in the first degree and murder in the second degree, as requested, and in refusing to submit the

case to the jury solely as a charge of manslaughter. The record before us, including defendant's own testimony and admissions, justified the court in submitting to the jury the question whether the killing was wilful, deliberate, premeditated, and malicious. In *Wellar* v. *People,* 30 Mich. 16, 19, 21, the defendant was convicted of murder by kicking the deceased while on the floor after she had fallen or been knocked down. There was no proof tending to show the use of a weapon. The issue was whether death resulted from a blow of the defendant's fist, a kick, or by accident. The court said:

"In determining whether a person who has killed another without meaning to kill him is guilty of murder or manslaughter, the nature and extent of the injury or wrong which was actually intended, must usually be of controlling importance.

"It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. It is not always necessary that he must have intended a personal injury to such person. But it is necessary that the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life. * * *

"The jury were sufficiently and rightly charged upon the extent of the respondent's liability for any intended killing. And if respondent willfully and violently kicked the deceased in such a way as he must have known would endanger her life, and her life was destroyed in that way, an actual intention of killing would not be necessary, as in such case the death would have been a result he might fairly be held to regard as likely."

Defendant was in love with his companion; he thought that she had been insulted by Parker during the course of the evening. He meditated an assault,

stepped from the car, had his coat off, struck Parker two violent blows knocking him down. Thus far, defendant might plead self-defense. We can find no justification in law for the defendant then stomping on the head, neck and shoulders of his prostrate and helpless victim. Death resulted from the stomping. It was well within the range of legal possibility that the jury might have found defendant guilty of murder of the first degree.

It was the province of the jury, and not of the court, to decide whether there was much or little testimony which would reduce the crime from murder to manslaughter. While there may be little testimony to reduce the crime to manslaughter, it was for the jury to measure the quantity of proof. *People* v. *Toner,* 217 Mich. 640 (23 A. L. R. 433).

"It will suffice to say that the testimony justified submitting the case to the jury on the charge of murder, and whether the testimony bearing on that charge was much or little was for the jury and not for the court." *People* v. *Vanderhoof,* 234 Mich. 419.

The court was not in error in submitting to the jury the issue as to whether defendant was guilty of murder or manslaughter.

Defendant claims error because the court in charging the jury repeatedly referred to the defendant "kicking" or "stomping" on Parker. The court said:

"Certain questions are in dispute. It is the claim of the prosecution that on that day in question Mr. Collins, without any justification or excuse, took off his coat, laid it aside, and that he struck Mr. Parker without any excuse, justification or reason; that he gave him what the prosecution claims was a one-two: one blow to the chin and one to the solar plexus, and that Mr. Parker went down. It is the further claim

of the prosecution that after he had done that he stomped upon the shoulders or basal region of the back of Mr. Parker's head, stomped or kicked, or as you have heard the testimony.  *  *  *  It is the claim of the defense that Mr. Collins did not kick him; that all he did was strike him these two blows which he claims were in self-defense, and that he did no more than was necessary to defend himself there on that day in question.''

The people's testimony tended to prove that the defendant ''stomped'' on the head and neck of the prostrate Parker. One of the people's witnesses testified that defendant ''did something with his feet.'' Another disinterested witness testified definitely that the defendant ''stomped'' on Parker's head, neck or shoulders while he was lying prone on the sidewalk. Defendant in his testimony denied this. His statement to the police shows that defendant was asked:

''*Q.* Did you kick him?
''*A.* I don't know if I did or not. If I did I am ashamed.''

There is no occasion for the court to indulge in technical niceties as to the difference between stomping and kicking. Either one implies an act of violence—in this case, the use of the feet applied with force to Parker while he was lying on the sidewalk.

When witnesses first observed Parker's form lying on the sidewalk, his feet were near the automobile, his body extending at an angle away from the car, his head and shoulders farther away. Later when the ambulance arrived, his head was nearer the car and his body more parallel with the car. We infer from the argument that defendant reasons that the injury might have been caused by the head striking

the running board of the car, in falling. This question of fact was for the jury and no error appears in the charge in submitting to the jury the issue as to the manner or cause of Parker's death.

The court submitted to the jury the question whether defendant acted in self-defense. Viewing all the testimony in the light most favorable to defendant, the court's instructions to the jury in this regard were more favorable to the defendant than he was entitled to. We fail to see how self-defense could be claimed to favor the defendant as to any of his acts of assault while Parker was lying on the sidewalk. If defendant then continued the assault, he was then the aggressor, not merely the defender of his person. Where the trial judge uses his own phraseology but sufficiently instructs the jury as to the law, as was done, no error is committed by failing to follow the wording of defendant's requests to charge.

In instructing the jury as to the presumption of innocence and the extent that defendant's intoxication might have on his guilt or innocence, the court said:

"I instruct you that it is a presumption of law that a person charged with a crime is innocent until he is proven guilty. That is to say, the law presumes that a man is innocent of the crime charged against him until it is proven that he is not. This presumption attends him all through the case until such presumption is overcome by evidence in the case that convinces you, and beyond a reasonable doubt, of his guilt; and this presumption of innocence applies to every element of the offense which is necessary to be established in order to convict him."

After fully explaining the necessary elements to prove first degree murder, second degree murder,

and manslaughter, and explaining what constitutes wilfulness, motive, malice, and premeditation, the court charged the jury as follows:

"I also instruct you, members of the jury, in a case of an offense such as the one charged, committed during a period of intoxication, the law presumes the defendant to have intended the obscuration and perversion of his faculties, which followed his voluntary intoxication. He must be held to have purposely blinded his moral perception and set his will free from the control or reason, to have suppressed the guards and invited the mutiny, and should therefore be held responsible as well for the vicious excesses of the will thus set free as for the acts done by its prompting. In other words, it is well-settled law in this State that voluntary drunkenness is not a defense to crime. A man who puts himself in a position to have no control over his actions must be held to intend the consequences. The safety of the community requires this rule. Intoxication is so easily counterfeited and, when real, is so often resorted to as a means of nerving a person up to the commission of some deliberate act and, withal, is so inexcusable in itself, that the law has never recognized it as an excuse for crime. But, in this connection, I instruct you further, members of the jury, that voluntary intoxication though being no excuse for the commission of a crime and will not relieve a person committing a crime from the penalty of the law, still, in a case of this kind, if there is evidence introduced that the defendant was intoxicated at the time it was alleged he committed the crime, it should be considered by you for the purpose of determining whether the accused at the time of the alleged killing was capable of forming a wilful, deliberate, and premeditated purpose to take life. And if in this case, although you believe from the evidence, beyond a reasonable doubt, that the de-

fendant killed the deceased in manner and form as charged in the information, still, if you further believe from the evidence that at the time he inflicted the fatal injuries he was so deeply intoxicated as to be incapable of forming in his mind a design deliberately and premeditatedly to do the killing, or if you entertain a reasonable doubt as to these things, then such killing would be only at most murder in the second degree or manslaughter.''

This has heretofore had the approval of this court and was proper under the facts and circumstances of this case. *People* v. *Garbutt,* 17 Mich. 9 (97 Am. Dec. 162); *Roberts* v. *People,* 19 Mich. 400; *People* v. *Toner, supra.*

We have examined the charge as a whole, in connection with defendant's assignments of error for failure to give defendant's requests to charge. The requests were adequately covered by the court.

Conviction and sentence affirmed.

CHANDLER, C. J., and NORTH, STARR, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.