PEOPLE *v.* GEIGER.

1. CRIMINAL LAW—MALICE.
Criminal malice is an intent to cause the very harm that results or some harm of the same general nature, or the doing of an act in wanton or wilful disregard of the plain and strong likelihood that some such harm will result.

2. SAME—ASSAULT—INTENT.
Assault by blows without a weapon may, under certain circumstances, permit a jury to infer an intent to kill.

3. SAME—INTENT—INFERENCES.
Intentions can only be proved by acts, and where any act is knowingly committed which naturally and usually leads to certain consequences, a jury has the right to draw the inference that such results are intended.

4. SAME—MURDER—INTENT TO KILL.
The jury could draw an inference of intent to kill in a prosecution for murder, where the evidence showed that the defendant had beaten his wife with his hand or fist about the head and face, that he had forced or pushed her into his car shortly

REFERENCES FOR POINTS IN HEADNOTES
[1] 21 Am Jur 2d, Criminal Law § 86.
[2-4] 26 Am Jur, Homicide §§ 600, 601.
[5] 26 Am Jur, Homicide § 45 *et seq.*
[6] 26 Am Jur, Homicide § 38.
[7] 21 Am Jur 2d, Criminal Law §§ 50–53.
[8] 21 Am Jur 2d, Criminal Law §§ 45, 53.

before he severely beat her, that although her appearance showed that she needed medical attention, he failed to take her to a local hospital immediately but waited approximately 6 or 8 hours during which he travelled more than 180 miles, and that he had said to a witness that he might be facing a "murder rap" (CL 1948, § 750.317).

5. HOMICIDE—CAUSATION.
    Wounds inflicted by defendant on decedent need not necessarily be fatal and the direct cause of death, it being sufficient that they cause death indirectly through a chain of natural effects and causes unchanged by human action to support a conviction of homicide.

6. SAME — SECOND-DEGREE MURDER — CAUSATION — EVIDENCE — IN-STRUCTIONS.
    Evidence that defendant had beaten his wife about the head and face with his hand or fist, that she became unconscious, that he waited several hours before taking her to a hospital, and that during that time she died by asphyxiation by choking to death on her own vomitus *held*, sufficient to permit a jury to find that the injuries were reasonably calculated to cause death and that the wounds contributed mediately or immediately to the death, and hence to justify an instruction to the jury as to the elements of second-degree murder (CL 1948, § 750.317).

7. CRIMINAL LAW—INSANITY—BURDEN OF PROOF.
    Once there is any evidence introduced of insanity in a criminal prosecution, the burden of proof is on the prosecution to establish defendant's sanity beyond a reasonable doubt.

8. SAME—INSANITY—BURDEN OF PROOF—INSTRUCTION—FAIR PRE-PONDERANCE OF THE EVIDENCE.
    Instruction to jury that where there is any evidence in the case by a defendant which tends to show that at the time of the commission of the offense he has been laboring under either permanent or temporary insanity, the duty of the prosecution is to prove the sanity of the defendant by at least a fair preponderance of the evidence *held*, to be reversible error, in prosecution for murder in which defendant was convicted of manslaughter (CL 1948, §§ 750.317, 750.321).

Appeal from Roscommon; O'Keefe (Dennis J.), J. Submitted Division 3 November 7, 1967, at Grand Rapids. (Docket No. 2,178.) Decided March 27,

1968.   Leave to appeal denied May 28, 1968.   See
381 Mich 753.

Carl Lewis Geiger was convicted of manslaughter.
Defendant appeals.   Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *John R. Hembree,*
Prosecuting Attorney and *James N. McNally,* Spe-
cial Prosecuting Attorney, for the people.

*Louisell & Barris,* for defendant on appeal.

Burns, J.   Defendant appeals from a circuit court
jury conviction of manslaughter.   CL 1948, § 750.321
(Stat Ann 1954 Rev § 28.553).

Sometime after 11 p.m., May 6, 1965, defendant
confronted his estranged wife, Sharon Geiger, in
the parking lot of a bar in Prudenville, Michigan,
as she was about to enter the bar with Joan Green-
ing.   Joan Greening testified that she and Mrs.
Geiger had had only one drink at another bar prior
to meeting the defendant, that Mrs. Geiger's health
appeared normal and that she observed no black and
blue marks or abrasions upon Mrs. Geiger that eve-
ning.   Joan Greening further testified that she was
told by the defendant to wait for Mrs. Geiger in the
bar, but that she waited in the parking lot and
observed the defendant talking to his wife and try-
ing to force her into the car; he then "threw" her
into the car and drove away.

State police officers who had interrogated the de-
fendant after the alleged offense testified that de-
fendant told them the couple drove to the Pruden-
ville elementary school playing field.   They argued
and got out of the car.   Defendant struck his wife
"two or three times" with his open hand and pushed
her to the ground in such manner that she bumped

her head against the car. When Mrs. Geiger failed
to get up and appeared unconscious, defendant
picked her up and placed her in his car. He then
allegedly attempted to clean her after driving a
short distance to a house trailer which the Geigers
had rented until May 1, 1965.

Early in the morning on May 7, defendant left
his wife in the trailer and drove to James Meigs'
house where defendant had been residing while he
and his wife were separated. Meigs was awakened
around 3:15 a.m., at which time defendant persuaded
Meigs to help move the automobile which Mrs.
Geiger had driven to the bar. After taking the
vehicle to Mrs. Geiger's parents' home, defendant
finally replied to Meigs' inquiries as to what was
going on; defendant stated that he might be "facing
a murder rap."

Between 3:30 a.m. and 4:30 a.m., May 7, defend-
ant aroused his employer, asked for $100 and was
given $50 in order to get away for a few days.

Defendant apparently returned to the house
trailer, placed his wife in the front seat of his car
and put a blanket over her. He drove south for
approximately 186 miles and at 7:30 a.m. or 8 a.m.,
stopped at the Addison Community Hospital, Ad-
dison, Michigan, where his wife was pronounced
dead.

Doctor Gordon J. Hammersley performed an au-
topsy and testified that Sharon Geiger had been
struck about the face and body by a blunt object
such as a hand or a fist. The deceased's external
marks of violence included swelling around both
eyes, the chin, both lips, the right forearm, the left
hand, both shoulders and the neck. There were
facial abrasions and dried blood covering the right
side of her face. Also present were small hem-
orrhages in the covering of the brain. The med-
ical cause of death was "aspiration of the gastric

contents into the air passages with resultant shock, asphyxia, collapse and pulmonary edema." In other words, sometime after the beating Sharon Geiger had attempted to vomit and had choked to death on her own vomitus.

Defendant related the night's activities to the State police, but in so doing he neglected to mention that he had forced Sharon Geiger into the car at the Sands bar. He also failed to mention his visits to James Meigs' house and to his employer's home until the police confronted him with these omissions.

Defendant was charged with first-degree murder,[1] but the jury was instructed only as to second-degree murder[2] and manslaughter. Defendant contends that the instructions regarding second-degree murder should not have been submitted to the jury because there were no proofs showing malice.

Malice has been defined as "an intent to cause the very harm that results *or some harm of the same general nature, or an act done in wanton or wilful disregard of the plain and strong likelihood that some such harm will result*." (Emphasis supplied.) *People* v. *Hansen* (1962), 368 Mich 344, 350. Consistent with this definition, it follows that an assault by blows without a weapon may, under certain circumstances, permit a jury to infer an intent to kill. *Wellar* v. *People* (1874), 30 Mich 16; *People* v. *Collins* (1942), 303 Mich 34; also, see 22 ALR2d 854.

On pages 19 and 20 of the *Wellar Case, supra,* Justice CAMPBELL said:

"In determining whether a person who has killed another without meaning to kill him is guilty of murder or manslaughter, the nature and extent of the injury or wrong which was actually intended, must usually be of controlling importance.

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).
[2] CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549).

"It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. It is not always necessary that he must have intended a personal injury to such person. But it is necessary that *the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life.* Generally the intent must have been to commit either a specific felony, or at least an act involving all the wickedness of a felony. And if the intent be directly to produce a bodily injury, it must be such an injury as may be expected to involve serious consequences, either periling life or leading to great bodily harm. There is no rule recognized as authority which will allow a conviction of murder where a fatal result was not intended, *unless the injury intended was one of a very serious character which might naturally and commonly involve loss of life, or grievous mischief.*" (Emphasis supplied.)

"The intent to kill must undoubtedly be established, as an inference of fact, to the satisfaction of the jury; but they may draw that inference, as they draw all other inferences, from any fact in evidence which, to their minds, fairly proves its existence. Intentions can only be proved by acts, as juries cannot look into the breast of the criminal. And where any act is knowingly committed which naturally and usually leads to certain consequences, a jury certainly has the right, in the exercise of ordinary sagacity, to draw the inference that such results are intended." *People* v. *Scott* (1859), 6 Mich 287, 296.

The question before this Court is: was there evidence from which a jury could infer defendant's alleged intent to produce great bodily injury with the attendant likelihood that death would result therefrom?

It was legally possible for the jury in this case to find that the nature and extent of Sharon Geiger's

injuries were reflective of an intent equivalent to a criminal purpose aimed against life. This consideration standing alone would be insufficient to establish malice, but the extent and nature of the injuries is not set against a solitary backdrop. Defendant "forced" or "pushed" the deceased into his car shortly before he severely beat her. After the beating decedent's unconsciousness and general physical appearance, as revealed to the jury from photographs and the autopsy report, showed a need for medical attention. Notwithstanding this need, defendant failed to immediately take his wife to a local hospital; instead he waited approximately 6 to 8 hours, during which time he travelled over 180 miles. Although by no means conclusive, defendant's statement to James Meigs that he "might be facing a murder rap" would give a jury additional insight into defendant's intent. An inference of intent to kill could be drawn from these and other facts presented in this case.

Defendant further argues, however, that the immediate cause of death, asphyxiation, renders a finding of malice impossible. It is true that the likelihood of death resulting from the head wounds *per se* was medically improbable. Nevertheless, the likelihood of death resulting as a natural and probable consequence of the beating was within the range of medical testimony from which a jury could find a causal connection between the assault and Mrs. Geiger's act of vomiting. The pathologist who performed the autopsy testified as follows:

"*Q.* [*prosecuting attorney*] Now my question to you is this: These blows on the head, these blows to the side of the face, or whatever the blows were, did they have anything to do with the asphyxiation?

"*A.* Yes, I think they did in that they indicated a trauma which resulted in minor brain and subarachnoid damage that probably caused some de-

gree of cerebral concussion, probably a temporary thing. That would contribute to diminution of laryngeal reflexes which would allow the asphyxiation.

"*Q.* In other words, if she hadn't had the blows to the head, blows to the side of the face, or the blows on the other parts of her body, would she have been able to—excuse my words—vomit and bring this content of the stomach up?

"*A.* I would think that she would have been able to vomit and remove it from her body in normal fashion."

26 Am Jur, Homicide, § 52, p 195, states:

"It is not indispensable to a conviction that the wounds be necessarily fatal and the direct cause of death. It is sufficient that they cause death indirectly through a chain of natural effects and causes unchanged by human action."

The evidence in this case would permit a jury to find that the injuries were " 'reasonably calculated to cause death' " and that the wounds " 'contributed mediately or immediately to the death.' " See *People* v. *Cook* (1878), 39 Mich 236, wherein on page 238 the Supreme Court quoted a portion of the trial court's jury instructions which included the aforementioned criteria and approved it as a correct statement of the law. The trial court did not commit error in instructing the jury as to the elements of second-degree murder.

Defendant last objects to the trial court's reference to the language, "the preponderance of the evidence," as utilized in the following instruction to the jury:

"At the outset there is a presumption in cases of this kind that the respondent[3] was sane, but as soon

---

[3] GCR 1963, 201.1 and 785.1 require that parties be denominated plaintiff or defendant in criminal, as well as civil, actions.

as evidence is offered by the respondent to over-throw this presumption, the burden shifts and then it rests upon the People to convince the jurors beyond a reasonable doubt of the respondent's sanity, as that is one of the necessary conditions on which guilt can be predicated. When any evidence is given which tends to overthrow that presumption, the jurors should examine, weigh and pass upon it with the understanding that, although the initiative in presenting the evidence is taken by the defense, the burden of proof in this part of the case is upon the prosecution to establish the conditions of guilt. Where there is any evidence in the case by the respondent which tends to show that at the time of the commission of the offense he has been laboring under either permanent or temporary insanity, it then becomes the duty of the prosecution to prove the sanity of the respondent by at least a fair pre-ponderance of the evidence, and unless they have done so, the defendant must be acquitted."

The correct rule was set forth in *People* v. *Krugman* (1966), 377 Mich 559, where the Court stated on page 563:

"A criminal defendant is presumptively sane. However, once there is any evidence introduced of insanity, the burden of proof is on the prosecution to establish defendant's sanity beyond a reasonable doubt. *People* v. *Garbutt* [(1868), 17 Mich 9]; *People* v. *Eggleston* (1915), 186 Mich 510."

We are aware that in *People* v. *Finley* (1878), 38 Mich 482, the Court approved an instruction similar to the one in the present case on the theory that (p 485):

"Inasmuch as it must be for the jury to determine whether or no the effect of the defendant's testimony has been overcome in their minds by adequate proof, if they think the testimony of insanity is thus overcome it is difficult to conceive

how they can further regard it, or how they could entertain a reasonable doubt on the case if convinced of the falsehood of the only ground on which the defense rested."

We cannot accept the premise that the tests "fair preponderance of the evidence" and "beyond a reasonable doubt" are the same, and we will not perpetuate such a theory.

Reversed and remanded for new trial.

Lesinski, C. J., and Holbrook, J., concurred.