## PEOPLE v KLAVE

Docket No. 66034. Submitted October 18, 1983, at Detroit.—Decided November 8, 1983.

Defendant, Dennis D. Klave, was convicted in the Macomb Circuit Court, John G. Roskopp, J., of second-degree murder following the death of his 28-month-old daughter. Defendant appeals. *Held:*

1. The trial court's conclusion that the defendant delivered the fatal blow was supported by sufficient evidence. The record supports the conclusion that defendant was guilty beyond a reasonable doubt.

2. The conclusion of the trial court that the defendant knew the possible consequences of his actions is sufficiently supported by the evidence. The duration of the beatings, as well as the severity and the way they were carried out, convinced the trial court beyond a reasonable doubt that the beatings, with the resulting severe injuries, were recklessly and wrongfully administered while the defendant was conscious of the risk involved.

3. Defendant made no showing of prejudice resulting from his absence from an in-chambers presentence conference attended by his attorney.

4. There was no showing that the defendant did not understand his right of allocution when the trial court asked him if he had anything to say before sentencing and the defendant replied: "No, Sir".

5. The trial court properly placed its findings as to each

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 821, 838.

[2] 5 Am Jur 2d, Appeal and Error §§ 611, 884.

[3] 40 Am Jur 2d, Homicide §§ 246, 499.

[4, 5] 40 Am Jur 2d, Homicide §§ 10, 44, 92, 437.

[6] 21 Am Jur 2d, Criminal Law §§ 531, 532.

21A Am Jur 2d, Criminal Law § 922.

Necessity and sufficiency of question to defendant as to whether he has anything to say why sentence should not be pronounced against him. 96 ALR2d 1292.

element of the crime on the record, and each finding was supported by the evidence.

Affirmed.

1. APPEAL — FINDINGS OF FACT — BENCH TRIAL — CLEAR ERROR.

Findings of fact by a trial court will not be set aside on appeal unless clearly erroneous; a finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.

2. CRIMINAL LAW — APPEAL — WITNESSES — CREDIBILITY — BENCH TRIAL.

Deference is given to a trial court's finding that the witnesses for the prosecution were more credible than defense witnesses in a bench trial where critical evidence came from witnesses because the trial judge has a superior opportunity to judge the credibility.

3. CRIMINAL LAW — SECOND-DEGREE MURDER — BURDEN OF PROOF.

It is incumbent upon the people to establish each and every element of the offense of second-degree murder beyond a reasonable doubt in a trial for second-degree murder.

4. CRIMINAL LAW — SECOND-DEGREE MURDER.

The prosecution in a trial for second-degree murder must prove that the death was caused by an act of the defendant and there must be a finding that the defendant intended to kill, or that he intended to do great bodily harm, or that he committed a wanton and wilful act the natural tendency of which is to cause death or great bodily harm; there must be a strong, plain likelihood that death or serious bodily harm will result and the defendant must have wilfully and wantonly disregarded the knowledge of the possible consequence of death or serious injury, if the third of the alternative mental states is to be proved (MCL 750.317; MSA 28.549; CJI 16:3:01).

5. HOMICIDE — SECOND-DEGREE MURDER — INTENT TO MURDER.

A defendant, convicted of the second-degree murder of his child, could have been found beyond a reasonable doubt to have violently hit and struck the child in such a manner that he must have known he was endangering the child's life where the evidence regarding the defendant's beatings of the child, the duration and the severity of the beatings, and the way they were carried out convinced the court beyond a reasonable doubt that the beatings were recklessly and wrongfully administered

while the defendant was conscious of the risk involved (MCL 750.317; MSA 28.549).

6. CRIMINAL LAW — PRESENTENCE CONFERENCES — RIGHT OF ALLOCU-
   TION — APPEAL.

    A defendant's absence from a presentence conference does not per se result in a violation of the defendant's right of allocution absent a showing of prejudice.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *George N. Parris,* Prosecuting Attorney, *Don L. Milbourn,* Chief Appellate Lawyer, and *Robert J. Berlin,* Assistant Prosecuting Attorney, for the people.

*James M. Biernat,* for defendant on appeal.

Before: V. J. BRENNAN, P.J., and CYNAR and C. W. SIMON, JR.,* JJ.

PER CURIAM. Defendant appeals as of right from his conviction, following a bench trial, of second-degree murder in the death of his 28-month-old daughter Sarah on April 30, 1981. Defendant was sentenced to a term of 15 to 30 years.

Robin D'Amato, the child's mother and defendant's girlfriend, testified that when she gave a statement to the Fraser Police Department regarding the events leading to the death she was told by the police that she would not be charged. The testimony indicated that defendant was hitting Sarah for no reason about three or four times a day. D'Amato saw him strike, kick and push her on several occasions. On one occasion she heard a "thud" against the bathroom wall. Sarah was crying and screaming, and defendant yelled at her and slapped her. D'Amato did not attempt to stop him because he would hit her for interfering and

---

* Circuit judge, sitting on the Court of Appeals by assignment.

she was afraid of him. Defendant threatened to kill Sarah two days before she died. D'Amato denied beating her and said she knew of no accidents involving Sarah. She testified that the three of them were "always together" and "more or less" inseparable. The beatings began in the beginning of April, 1981. Defendant punched Sarah in the stomach three times, causing bruises. D'Amato said they drank on weekends. Sarah was always asleep when they were drinking. The beatings were administered when defendant was not drinking. When they visited defendant's parents, he had excuses for the bruises, and D'Amato did not tell them what was happening. She wanted to take Sarah to a hospital because she thought her knee was broken, but defendant would not let her because of the bruises on her bottom. When Sarah became comatose on April 30, 1981, and the police were called, D'Amato told them that Sarah fell down the stairs and had been bitten on the cheek by a nephew. She gave the story at defendant's insistence. At the hospital, defendant rehearsed the story and was looking for a way to get out of the hospital. In fact, defendant had grabbed the child by the cheek and smacked her.

Several police officers testified, confirming the presence of bruises all over the child's body. They also said that both defendant and D'Amato had told them that Sarah had fallen down the stairs before D'Amato implicated the defendant at the police station.

Officer James Colby interviewed defendant and D'Amato in the police station. After being given her *Miranda*[1] warnings, D'Amato said that Sarah fell down the stairs. Colby indicated that such

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

injuries could not occur in that way. Crying and upset, D'Amato said she wanted to tell the truth and proceeded to tell of the beatings.

Sergeant Charles Schinning testified, on a special record, that during a second interview with defendant the defendant said, "She told you the truth. You know what the truth is. I am not going to say anything else without conferring with an attorney". However, the trial judge found that the statement had been given after a request for counsel and said that the evidence presented in the special record would not be considered.

Coreen Murphy, manager of the Royal Motel, testified that a maid, Terry Troia, came into the office on April 20, 1981, and said that a man was beating a child. Troia testified that she heard a man screaming, a child crying, and slaps. She saw defendant exit from the motel room from which the sounds came; a child was in his arms.

Mr. and Mrs. Sears testified. Defendant told Mr. Sears that he slapped Sarah. On one occasion, defendant and D'Amato left Sarah alone in the room. Defendant also left D'Amato and Sarah in the room when he worked on cars.

Medical Examiner Werner Spitz testified that the cause of death was the tearing of a kidney and the tearing of an intestine, with resulting peritonitis. He opined that the injury occurred as the result of a blow to the right flank. He said that the injury to the flank was approximately one week old, and that the rest of the injuries and bruises extended over a period of up to three weeks. The bruises were described as deep bruises. All the injuries were the result of beatings. There was an injury to the forehead as the result of a blow or violent fall on the area. Sarah had abdominal surgery while very young. The surgery had "an

influence on the mechanism of injury" in that adhesions had formed and the intestine had become more fixed to the surrounding organs. This caused them to be unable to move and to be more susceptible to damage. This did not influence the kidney injury. Spitz called Sarah a battered child. At the time of her death, the autopsy revealed that Sarah's body had bruises on the face and forehead, the chest, the right arm, the abdomen, the knee, along the spinal column to the buttocks, on the back of the legs as far down as the ankles, and a large bruise on the right flank. The mark on the cheek was possibly caused by a bite and was only a few days old.

Violet Klave, defendant's mother, testified that defendant went to "special" schools and was hospitalized at Northville and Lafayette Clinic. She never saw him hit or push Sarah. She saw Sarah almost every day except for the last three to four days prior to her death. On those days, D'Amato visited Klave's house, but said a babysitter was with Sarah. She testified that the last she saw the child Sarah had no marks on her.

Herman Klave, defendant's brother, saw Sarah a week prior to her death and saw no marks.

Lynette Roland, defendant's ex-wife, testified that defendant still saw their son occasionally, and that defendant never hit his son.

Dr. Robey, defendant's expert-psychiatrist, testified that defendant had organic brain disease and epilepsy that was successfully treated with medication. He said that defendant had a certain level of retardation, but was polite and pleasant. Defendant told Robey that he spanked and slapped Sarah on occasion but did not think it caused bruises.

When asked by Robey where the bruises came

from, he responded that if D'Amato and the police said he did it, he must have done it. However, he denied doing it. Defendant really cared about Sarah and only stayed with D'Amato for the child, according to Robey. Robey opined that some forms of injury are probably inflicted more often by female attackers while other forms are probably inflicted by male attackers and that the bite to the cheek was probably done by a woman. He said that when drinking the defendant had a sleepy pattern, not a violent one. He said he doubted very much that defendant administered the death blow, but, if so, defendant could not have had the specific intent because of his background and drinking. According to Robey's notes, defendant told him that Robin D'Amato beat Sarah. He opined that the size of the bruise on the right flank made it unlikely that it was made with defendant's fist and would be more consistent with one made by a woman's shoe.

Dr. Benedex, the prosecution's rebuttal-psychiatrist, found defendant hostile and angry. Defendant told the witness he slapped Sarah on several occasions, including about four days prior to her death, but he denied beating her. He had been drinking a quart of liquor a day until the last three to four days prior to the death. Dr. Benedex found no evidence of mental illness and said defendant could form the specific intent. While Dr. Robey diagnosed him as a passive-aggressive personality "far down" on the passive end, she opined that he had an anti-social personality disorder and was capable of violent behavior. She also disagreed with Robey's conclusions about the patterns of gender-identifiable injuries and the elements of the profile of a child abuser.

Defendant did not testify.

Defendant contends that the people have failed to establish by sufficient evidence that defendant either struck the fatal blow or possessed the requisite intent required for second-degree murder, both of which elements were required to be proven beyond a reasonable doubt. We disagree with defendant's contention.

The trial court's finding of fact will not be set aside unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *People v Saxton,* 118 Mich App 681; 325 NW2d 795 (1982), *lv den* 414 Mich 931 (1982). Where, as here, critical evidence came from witnesses, deference is given to the court's finding that witnesses for the prosecution were more credible than defense witnesses because the trial judge had a superior opportunity to judge the credibility. *People v Terlisner,* 96 Mich App 423; 292 NW2d 223 (1980), *lv den* 412 Mich 917; 315 NW2d 127 (1982).

Defendant herein has been charged with second-degree murder, a violation of MCL 750.317; MSA 28.549.

In the case at bar, it was incumbent upon the people to establish each and every element of the offense of second-degree murder beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979). Criminal Jury Instruction 16:3:01 requires, among other things, that the prosecution prove the death was caused by an act of the defendant, and that there must be a finding that the defendant intended to kill, or that he intended to do great bodily harm, or that he committed a wanton and wilful act the natural tendency of which is to cause death or great bodily

harm. *People v Langworthy,* 416 Mich 630, 650-651; 331 NW2d 171 (1982). There must be a strong, plain likelihood that death or serious bodily harm will result and the defendant must have wilfully and wantonly disregarded the knowledge of the possible consequence of death or serious injury, if the third mental state is to be proved.

## A

### PROOF OF FATAL BLOW

The trial court relied on several witnesses to support the conclusion that the defendant delivered the fatal blow. Specifically, the court considered the testimony of:

1. Robin D'Amato, who said that defendant kicked the deceased in the small of the back and punched the deceased in the stomach a number of times with his fist;

2. The hotel maid and manager;

3. The police and fire persons, as to the bruised-covered body; and

4. Dr. Werner Spitz, who indicated Sarah D'Amato suffered internal scars, deep bruises, and injuries over her body, the internal injuries to the stomach, intestines, the peritonitis, and the tearing of the kidney being caused by the alleged beatings which extended over three weeks.

In *People v Barnwell,* 60 Mich App 291; 230 NW2d 400 (1975), another child abuse case, the defendant-mother was convicted of manslaughter. The Court noted the presence of testimony which, if believed by the trial judge, would rule out accidental injury. The Court ruled that the judge made the permissible inference that the defendant inflicted the blow to the head. The Court concluded

that the record sustained the defendant's guilt beyond a reasonable doubt.

Compared to *Barnwell,* the proofs relied upon by the trial judge in the instant case were stronger.

## B

### Defendant's State of Mind

The trial judge found that the injuries were "inflicted viciously because of the nature of the vicious beatings". From all the testimony, the court concluded that the defendant violently hit and struck the child in such a manner that he must have known he was endangering her life. The duration of the beatings, as well as the severity and the way they were carried out, convinced the court beyond a reasonable doubt. The beatings by defendant, with the resulting severe injuries, were recklessly and wrongfully administered while defendant was conscious of the risk involved.

In *People v McFee,* 35 Mich App 227; 192 NW2d 355 (1971), *lv den* 388 Mich 763 (1972), the defendant was convicted by a jury of second-degree murder in the death of his foster son. The defendant beat the boy savagely for several hours. The child died when particles of partially digested food struck the vocal cords and caused a cardiac arrest in response to the coughing reflex.

The defendant claimed that the finding of malice necessary to support a second-degree murder conviction was impossible to prove under the circumstances. This Court responded:

"In cases similar to the one at bar, the quantum of murderous intent required to support a conviction of second-degree murder has been adequately explained:

" 'In determining whether a person who has killed

another without meaning to kill him is guilty of murder or manslaughter, the nature and extent of the injury or wrong which was actually intended, must usually be of controlling importance.

" 'It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. It is not always necessary that he must have intended a personal injury to such person. But it is necessary tht the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life. Generally the intent must have been to commit either a specific felony, or at least an act involving all the wickedness of a felony. And if the intent be directly to produce a bodily injury, it must be such an injury as may be expected to involve serious consequences, either periling life or leading to great bodily harm. There is no rule recognized as authority which will allow a conviction of murder where a fatal result was not intended, unless the injury intended was one of a very serious character which might naturally and commonly involve loss of life, or grievous mischief.' *Weller v People,* 30 Mich 16, 19, 20 (1874) as cited with approval in *People v Geiger,* 10 Mich App 339, 343-344; 159 NW2d 383 (1968). In accord: *People v Scott,* 6 Mich 287, 296 (1859).

"Once it was determined that defendant's beating the child had started a physical chain reaction resulting in death, the jury could draw the inference of murderous intent. 40 Am Jur 2d, Homicide § 85, p 378. Based on evidence of the type of beating inflicted, its duration and severity, and the systematic nature in which it was carried to a conclusion, a jury could find that defendant knowingly committed an act which led to the result intended. *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), Anno: 'Criminal liability for excessive or improper punishment inflicted on child by parent, teacher, or one in *loco parentis',* 89 ALR2d 396, 410-412." *McFee, supra,* pp 231-232.

The trial court in this case found that the defendant acted in wilful disregard of the plain and

strong likelihood that harm would result and intent was inferred from the defendant's beating of the child which started a physical reaction resulting in the child's death. The conclusion that defendant knew the possible consequences of his actions is sufficiently supported by the evidence.

Defendant contends the sentence should be vacated because defendant was not present at an in-chambers presentence conference. We do not agree.

At the sentence hearing, defendant's attorney stated that he found the contents of the presentence report to be accurate and acknowledged having reviewed the contents of the diagnostic interview and recommendation of the psychologist. Defense counsel opined that it was inequitable that Robin D'Amato had not been brought to the bar of justice and unfair that defendant should carry the entire burden.

Defendant claims that his absence denied him the right of allocution and was unconstitutional. In *People v Pulley*, 411 Mich 523; 309 NW2d 170 (1981), a majority of the Court was of the opinion that the defendant was not prejudiced per se by his absence from the sentencing conference. See, also, *People v Billington*, 116 Mich App 220; 323 NW2d 343 (1982). Defendant here has not made any showing of prejudice.

Defense counsel raises a further argument based on defendant's mild to moderate retardation. The court asked defendant if he had anything to say before sentencing. Defendant replied: "No, Sir". It is argued that it cannot be assumed that defendant understood the court's invitation to speak.

There was no showing defendant did not understand his right of allocution. While there was some degree of retardation, the evidence at trial indi-

cates that defendant would be able to understand the question of the trial judge.

It is the defendant's position that the trial court failed to find that defendant performed the act which caused the death of Sarah D'Amato. We disagree.

GCR 1963, 417.1 states in pertinent part:

"It will be sufficient if the court makes brief, definite, and pertinent findings and conclusions upon the contested matters without over elaboration of detail or particularization of facts."

The judge's findings were properly on the record pursuant to GCR 1963, 517.1. The judge placed findings as to each element on the record, and each finding was supported by the evidence.

Affirmed.