**David L. JOHNSON, Inmate No. 155428, Petitioner,**

v.

**Jerry HOFBAUER, Respondent,**

**No. CIV.99–CV–75467–DT.**

United States District Court, E.D. Michigan, Southern Division.

June 18, 2001.

David Johnson, Jackson, MI, pro se.

Laura G. Moody, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Jerry Hofbauer, respondents.

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

TARNOW, District Judge.

David L. Johns, ("petitioner"), presently confined at the Marquette Branch Prison

in Marquette, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed *pro se*, petitioner challenges his conviction of one count of second degree murder, M.C.L.A. 750.317; M.S.A. 28.549, and one count of possession of a firearm in the commission of a felony. M.C.L.A. 750.227b; M.S.A. 28.424(2). For the reasons stated below, the petition for writ of habeas corpus is DENIED.

## I. *BACKGROUND*

Petitioner was charged with first degree murder and felony-firearm for the shooting death of Michael Groce in Battle Creek, Michigan on November 9, 1994. Following a jury trial in the Calhoun County Circuit Court, petitioner was found guilty of the lesser offense of second degree murder and guilty of the felony-firearm charge.

Keith Cork testified that he was at 25 Blenken Court in Battle Creek, Michigan on the night of the shooting. Present at the house were James Dickerson, Dickerson's girlfriend Rosemarie Ware, and petitioner. Cork indicated that Dickerson and Willie Shavers lived at this residence. (Trial Transcript, hereinafter "T"., 03/15/95, pp. 51–55). Later in the evening, the victim Michael Groce arrived at the house with Phyllis Brown. Although Cork did not see a weapon in Groce's possession, Cork testified that Groce always acted like · he had one. (*Id.* at p. 56). Cork also testified that Groce was known to carry a .9 millimeter gun and claimed to be "strapped" all the time. (*Id.* at pp. 72, 125). Cork believed that Groce had a firearm in his possession the night of the shooting. (*Id.* at p. 124).

After Brown went to a back bedroom of the residence, petitioner told her several times that she would have to leave. (*Id.* at pp. 60, 115, 119–123). Groce became upset

at petitioner's requests to Brown that she leave. Petitioner ultimately told Groce that he would have to leave the house also. (*Id.* at pp. 63, 69, 72). Brown and Groce finally left. Cork also left the house, returning twenty minutes later with an AK–47 assault rifle and a banana clip. (*Id.* at p. 64). Cork put the gun on the bed, leaving the clip next to it. When Cork went back to the front room of the house, the victim was outside trying to come in. James Dickerson was outside, asking the victim to leave. (*Id.* at p. 67). Petitioner was inside the house at the time. The victim was telling petitioner to "bring his ass outside". (*Id.* at p. 68). The persons inside of the house became afraid that Groce would get inside of the house and ran to the back. Petitioner went to bedroom and grabbed the assault rifle. (*Id.* at p. 69). Cork went into the bathroom, where he heard some shots. Cork testified that the shots were all fired in quick succession. (*Id.* at pp. 73, 78). Cork left the house. He never saw the assault rifle in petitioner's hands, nor did he ever see his rifle again. (*Id.* at pp. 75, 77).

At trial, Cork claimed that the AK–47 was a semi-automatic weapon. (*Id.* at p. 77). However, defense counsel impeached Cork with his testimony from the preliminary examination, in which Cork testified that he thought that the rifle was an automatic weapon. (*Id.* at p. 88). Cork further acknowledged that he had never actually fired the weapon. (*Id.* at p. 92). Cork, in fact, admitted that he had seen Steven Armstrong shoot the rifle, and it fired one shot right after another. (*Id.* at p. 94).

Alvin LeBlanc was present with Keith Cork on the night of the shooting. His testimony mirrored Cork's in most respects. (T., 03/16/95, pp. 5–21). Like Cork, LeBlanc heard Groce return to the house, knock on the door, and ask petition-

er to come outside. (*Id.* at p. 22). James Dickerson went outside before petitioner did. LeBlanc heard arguing, followed by gunshots. (*Id.* at p. 25). LeBlanc could not see either Dickerson or petitioner prior to the shooting, but heard some gunshots go off very quickly. (*Id.* at pp. 27–28). LeBlanc was able to see a car outside turning in circles. (*Id.* at p. 30). Although LeBlanc did not see Groce in possession of a firearm, he testified that Groce kept his hand in his coat pocket. (*Id.* at p. 33). LeBlanc had seen Groce with a weapon before, and thought that he might have had a firearm in his pocket on the night of the shooting. (*Id.* at pp. 57–58). LeBlanc further admitted that he was concerned that Groce had returned to the house to shoot someone. (*Id.* at pp. 59, 65–66). LeBlanc did not know the difference between automatic and semi-automatic weapons. (*Id.* at p. 88).

Dr. Laurence Simson testified that he performed the autopsy on the victim. The victim died as the result of multiple gunshot wounds, including wounds to the front side of the head, to the neck, to the chest, to the torso, to the right thigh, and to the left leg. (*Id.* at pp. 101–113). The victim had a blood alcohol content of .16 and significant amounts of cocaine and other drugs in his blood and urine. (*Id.* at p. 112).

Rosemarie Ware's testimony was consistent in many respects to the testimony of Cork and LeBlanc. When Brown and Groce left the house the first time, Groce threatened petitioner. The victim returned and tried to force his way into the house. (*Id.* at pp. 129–130). While the victim was attempting to get into the house, he was telling petitioner that "his ass was his" and appeared in a rage. (*Id.* at p. 168). Petitioner retrieved the gun that Cork had brought to the house while the victim was outside. Although Ware did not see the victim with a gun, he had

his hand in his coat pocket as though he had something there. Ware believed that it was a gun. (*Id.* at pp. 137, 158, 176). After petitioner retrieved the gun, he went outside. Ware heard shots, occurring "right behind each other". (*Id.* at p. 138).

James Arthur Dickerson testified that he lived at 25 Blenken Court in Battle Creek, Michigan on November 9, 1994 with Willie Shavers. Dickerson testified that petitioner did not live at this house (*Id.* at p. 179), although he later testified on cross-examination that petitioner occasionally spent nights at the house. (*Id.* at pp. 226–227). Dickerson testified that there had been an argument between petitioner and the victim three days previous to the shooting, in which harsh words had been exchanged. (*Id.* at p. 184). On November 9, 1994, Dickerson, Brown, and Groce had been smoking crack cocaine. (*Id.* at p. 186). Petitioner asked Brown to leave the house several times. Groce told petitioner not to say anything to her and had his hand in his pocket. (*Id.* at p. 189). Brown and Groce left, with Groce telling petitioner that he would be back. (*Id.* at p. 192). Petitioner told Groce that if he came back again, he would hit him in his head and knock his "ass" down. Petitioner also told Groce to be prepared to fight if he returned. (*Id.* at p. 194).

When the victim returned to the house, he tried to get back inside. Dickerson forced Groce out the door and went after him, closing the door behind him. (*Id.* at p. 198). Groce had been drinking and was yelling. Groce told Dickerson that he wanted to kick the petitioner's "ass". (*Id.* at p. 199). Although Dickerson did not see a gun, Groce still had his hand in his pocket. Groce also threatened to shoot Dickerson because he was in his way. (*Id.* at p. 201). At this point, petitioner came out onto the porch with an AK–47. Petitioner told Dickerson to get out of his way

twice. Dickerson tried to stop petitioner from shooting the victim. (*Id.* at pp. 202–204). The victim got into his car, which was still running. (*Id.* at p. 204). As the car was backing away in reverse towards Blenken Court, petitioner began shooting. (*Id.* at pp. 209–211). As the car was pulling out onto Blenken Court, it hit a curb, spun out of control, and hit the front porch of the house. (*Id.* at pp. 212–214). Petitioner was shooting the entire time that the car was moving. Dickerson estimated that twenty five to thirty shots were fired. (*Id.* at p. 214).

On cross-examination, Dickerson indicated that he was aware that Groce carried a gun. Defense counsel also impeached Dickerson with a statement he made to the police three days after the shooting, in which he told the police that before petitioner began firing the assault rifle, the victim had pulled out a gat (gun), only after which petitioner began firing. Dickerson further acknowledged that he had told the police that the victim had a .9 millimeter gun in his possession. (*Id.* at pp. 254–255, 258). Dickerson, however, attempted to explain this inconsistency by stating that he had only assumed that the victim had a gun in his possession. (*Id.* at p. 258).

In response to a question from the trial court, Dickerson testified that the AK–47 was a semi-automatic, as opposed to an automatic weapon. Dickerson based this conclusion on his observations of the weapon being fired on the night in question. In response to a follow-up question, Dickerson acknowledged that "semi-automatic" meant that one would have to pull the trigger at each round. (*Id.* at pp. 277–278). When Dickerson was later recalled, he testified that he had told petitioner that Groce had shot up a place where he lived sometime around the end of October 1994. (T., 03/17/95, p. 85). Dickerson also testified that petitioner had been using alcohol and cocaine on the night in question. (*Id.* at p. 89).

Officer Timothy Kendall responded to the scene of the shooting and found the victim's car against the front porch of the house, with the motor still running. (*Id.* at p. 22). The victim was slumped over with a hole in his head. No weapons were recovered from the area. (*Id.* at pp. 24, 28).

Officer Kraig Dingman also responded to the crime scene. Officer Dingman had heard approximately twenty shots coming from the vicinity of Blenken Court. (*Id.* at p. 58). When asked if the gunfire sounded like it had come from an automatic weapon, Dingman testified that he thought that the shots were too slow and sounded as though they had come from a semi-automatic weapon. (*Id.* at p. 73).

Detective Van Stratten recovered twenty six spent casings from a 40 foot area around the scene. The farthest one was thirty five feet away from the house. An additional casing was found the next day. (*Id.* at pp. 131–132).

Officer Leonardo Rivera arrested petitioner on November 13, 1994. (*Id.* at p. 233). Petitioner told Rivera that he had nothing to do with the shooting. (*Id.* at p. 236). Detective Davis Adams interrogated petitioner following his arrest. In his first statement, petitioner denied any involvement in the shooting. In a second statement, petitioner told Adams that he shot the victim in self-defense. (T., 03/20/95, pp. 40–48).

Petitioner testified in his own behalf that he was living at 25 Blenken Court at the time of the shooting. The Sunday prior to the incident, petitioner had asked Phyllis Brown to leave the house. The victim had been at the house and had argued with the petitioner. (*Id.* at p. 65).

During this argument, the victim put his hand in his pocket and threatened petitioner. Petitioner fled the house, because he did not want to get shot in his own home. (*Id.* at p. 66). He returned home when the victim left and spoke with James Dickerson about the victim intimidating him with a gun in his pocket. (*Id.* at p. 67). On the night of the shooting, petitioner again asked Brown to leave the house. (*Id.* at p. 69). The victim again started an argument with petitioner about Brown. Brown and Groce left. Petitioner later heard a car drive up into the driveway and somebody indicated that the victim had returned. Groce tried to force his way into the house. Dickerson told him he wasn't going to do anything to petitioner and forced Groce outside. (*Id.* at p. 75). Petitioner was worried about the victim shooting him, noting that everybody at the house believed that Groce always carried a weapon with him. (*Id.* at p. 76). Somebody told petitioner that the victim was going to shoot him and that he would have to defend himself. Petitioner grabbed Keith Cork's gun off the bed. He indicated that he had never used that gun before. (*Id.* at p. 79). Petitioner walked to the front door and opened it. As petitioner stepped outside, Dickerson turned around and said "oh, shit". Petitioner testified that he observed the victim taking a chrome object out of his pocket. Petitioner believed that to be the .9 millimeter gun that he carried every day. (*Id.* at pp. 81–83). Petitioner testified that the victim was pulling the object out of his pocket as he was running to his car. Petitioner shot the gun and it made a big explosion. (*Id.* at p. 84). When the gun went off, the victim's car began going around and around. Petitioner was still shooting at the car, because he was waiting for the victim to shoot back at him. Petitioner admitted that no shots were fired at him. He further indicated that when he started shooting, he blacked

out. (*Id.* at p. 85–86). Petitioner stated that he shot at the victim to scare him. He further testified that he shot at the victim, because he thought that the victim was going to shoot him. (*Id.* at p. 87). Petitioner insisted that he only pulled the trigger of the gun one time and denied pulling it twenty six times. (*Id.* at pp. 106–107).

On cross-examination, petitioner admitted that he was aiming at the car the entire time that he was firing the weapon. (*Id.* at p. 92). Petitioner further admitted that he gave an address of 149 Jordan Street to Detective Adams at the time of his arrest, but insisted that this was only a mailing address. (*Id.* at p. 93). Petitioner also admitted that he had lied to Detective Adams when he told him that "Sticks" had done the shooting. (*Id.* at p. 94). The prosecutor also asked petitioner about why he didn't attempt to run out the back door of the house when the victim threatened him. (*Id.* at p. 95–96). Petitioner acknowledged that no shots were fired at him. (*Id.* at p. 104).

Petitioner's conviction was affirmed on appeal. *People v. Johnson,* 185409 (Mich. Ct.App. March 20, 1998); *lv. den.* 459 Mich. 931, 615 N.W.2d 736 (1998). Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

I. Petitioner was denied due process of law by the denial of his motion for directed verdict on the charge of first degree murder and his conviction of second degree murder based on insufficient evidence.

II. Petitioner was denied a trial by a jury representing a fair cross section of the community where there was only one Black [African–American] in the jury venire.

III. Petitioner was denied a fair trial by the prosecutor's failure to produce an

endorsed witness who could have answered the jury's questions.

IV. The trial court erred in allowing the bloodied clothing of the deceased to be introduced into evidence when the clothing had little probative value and had a high likelihood of inflaming the passions and prejudices of the jury.

V. The prosecutor denied petitioner a fair trial by misstating the law and arguing that the petitioner had a duty to retreat in his own home.

VI. Petitioner was denied a fair trial by the trial court's refusal to give his requested instruction on imperfect self-defense.

VII. The trial court denied petitioner his closing argument by adding an instruction to the original jury charge after both counsel had completed their closing arguments.

VIII. Petitioner was denied his right to effective assistance of counsel at trial; petitioner is also entitled to a new trial based on newly discovered evidence.

## II. STANDARD OF REVIEW

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio*, 128 F.3d 322, 326 (6th Cir.1997).

■ A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)(Concurrence of Scalia, J.). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 1522(Scalia, J. concurring).

## III. DISCUSSION

I. Petitioner was denied due process of law by the denial of his motion for directed verdict on the charge of first degree murder and his conviction of second degree murder based on insufficient evidence.

Petitioner first claims that there was insufficient evidence of premeditation and deliberation to submit the original first degree murder charge to the jury. Petitioner alleges that the trial court therefore erred in denying his motion for directed verdict. Petitioner further alleges that there was insufficient evidence to convict him of the crime of second degree murder.

### A. *Standard of Review.*

 A habeas court, "reviews claims that the evidence at trial was insufficient for a conviction by asking 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir.2000); *cert. den.* 531 U.S. 1021, 121 S.Ct. 588, 148 L.Ed.2d 503 (2000)(citing to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Matthews v. Abramajtys*, 92 F.Supp.2d 615, 632 (E.D.Mich.2000) (citations omitted).

### B. The individual claims.

1. The failure to direct a verdict on the first degree murder charge.

 Petitioner first claims that the trial court erred in denying his motion for a directed verdict and permitting the first degree murder charge to be submitted to the jury for their consideration. However, petitioner was convicted at trial of the lesser included offense of second degree murder and therefore acquitted of the higher first degree murder charge. The submission to a jury of a criminal charge constitutes harmless error where the habeas petitioner is acquitted of that charge. *Daniels v. Burke*, 83 F.3d 760, 765 fn. 4 (6th Cir.1996) (internal citations omitted).

 Moreover, there was sufficient evidence of premeditation and deliberation to submit the charge of first degree murder to the jury. To constitute first degree murder in Michigan, the state must establish that a defendant's intentional killing of another was deliberated and premeditated.

*Grant v. Rivers*, 920 F.Supp. 769, 786 (E.D.Mich.1996)(Gadola, J.)(quoting *People v. Coddington*, 188 Mich.App. 584, 599, 470 N.W.2d 478 (1991); *lv. den.* 439 Mich. 970, 483 N.W.2d 364 (1992)). The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. Premeditation may be established through evidence of the following factors:

1. the prior relationship of the parties;
2. the defendant's actions before the killing;
3. the circumstances of the killing itself;
4. the defendant's conduct after the homicide.

*People v. Anderson*, 209 Mich.App. 527, 537, 531 N.W.2d 780 (1995).

 Premeditation and deliberation require sufficient time to allow the defendant to take a second look at his or her actions. *People v. Tilley*, 405 Mich. 38, 44–45, 273 N.W.2d 471 (1979). The time interval may be minimal. *Id.* A sufficient time lapse to provide an opportunity for a "second look" may be merely seconds, minutes, or hours or more, dependant on the totality of the circumstances surrounding the killing. *People v. Berthiaume*, 59 Mich.App. 451, 456, 229 N.W.2d 497 (1975). Premeditation and deliberation may be inferred from the type of weapon used and the location of the wounds inflicted. *People v. Berry*, 198 Mich.App. 123, 128, 497 N.W.2d 202 (1993); *People v. Coddington*, 188 Mich.App. at 600, 470 N.W.2d 478. Use of a lethal weapon will support an inference of an intent to kill. *People v. Turner*, 62 Mich.App. 467, 470, 233 N.W.2d 617 (1975).

When viewed in a light most favorable to the prosecution, the evidence presented at trial established the elements of premeditation and deliberation. The evidence es-

tablished that petitioner and the victim had several prior arguments. Following the last argument, while the victim was outside the house, petitioner walked to a back bedroom, grabbed an assault rifle, and walked onto the porch of the house. Petitioner ordered Jarnes Dickerson twice to get out of his way and ignored Dickerson's pleas not to shoot the victim. Petitioner began firing the assault rifle at the victim as the victim retreated in his vehicle. Petitioner fired twenty six shots at the victim, and there was evidence that this weapon was semi-automatic, meaning that petitioner would had to have pulled the trigger twenty six times. Viewed in a light most favorable to the prosecution, there was sufficient evidence of premeditation and deliberation to submit the first degree murder charge to the jury. Because petitioner was acquitted of this charge, any error in submitting this charge to the jury was harmless.

2. The insufficiency of the evidence to convict petitioner of second degree murder.

■■■■ Petitioner next contends that the evidence was insufficient to convict him of second degree murder. The elements of second degree murder are:

1. an intent to kill;

2. an intent to do great bodily harm; or

3. an intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result.

*People v. Dykhouse*, 418 Mich. 488, 494, 345 N.W.2d 150 (1984). To prove second degree murder, a prosecutor must establish that the defendant either (1) intended to kill or do great bodily harm to the victim, or (2) committed a wanton and wilful act the natural tendency of which is to cause death or great bodily harm. *Peo-*

*ple v. Klave,* 130 Mich.App. 388, 395–396, 343 N.W.2d 565 (1983).

■■■ Petitioner contends that the sufficiency of the evidence needed to convict him of second degree murder was negated by evidence that he shot the victim in self-defense. Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F.3d 712, 713, fn. 1 (6th Cir.1999); *cert. den.* 528 U.S. 1050, 120 S.Ct. 588, 145 L.Ed.2d 489 (1999)(citing to *People v. Heflin*, 434 Mich. 482, 456 N.W.2d 10 (1990)).

In rejecting this claim, the Michigan Court of Appeals noted that the evidence indicated that petitioner began shooting as the victim was retreating. There was no evidence that the victim was actually armed and the evidence of whether the victim appeared to be drawing a weapon was conflicting. Viewing the evidence in a light most favorable to the prosecution, the Michigan Court of Appeals concluded that petitioner had the requisite intent for second degree murder. *People v. Johnson*, Slip. Op. at * 2.

■■■ When viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to conclude that petitioner committed second degree murder and did not act in self-defense. The jury chose to believe Dickerson's testimony and rejected petitioner's testimony that he acted in self-defense. A reviewing court does not re-weigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Kines v. Godinez*, 7 F.3d 674, 678 (7th Cir.1993). It is the

province of the fact finder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir.1992). The jury's resolution of questions of credibility and demeanor is entitled to special deference. *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir.1985). In reviewing a sufficiency of evidence claim, this Court must draw all available inferences and resolve all credibility issues in favor of the jury's verdict. *Spalla v. Foltz*, 615 F.Supp. 224, 227 (E.D.Mich.1985)(Cohn, J.); *aff'd* 788 F.2d 400 (6th Cir.1986); *cert. den.* 479 U.S. 935, 107 S.Ct. 410, 93 L.Ed.2d 362 (1986).

In the present case, petitioner has failed to demonstrate the incorrectness of the state court's findings on the issue of self defense by clear and convincing evidence, in light of the deference to be accorded to state-court fact-finding, as well as the traditional deference accorded to the jury's resolution of disputed factual issues. *See Seymour v. Walker*, 224 F.3d 542, 551–552 (6th Cir.2000); *cert. den.* —— U.S. ——, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001). Because there was sufficient evidence to conclude that petitioner did not act in self-defense, petitioner's first claim is without merit.

II. Petitioner was denied a trial by a jury representing a fair cross section of the community where there was only one Black [African–American] in the jury venire.

■■■ Petitioner next claims that he was denied a trial by a jury representing a fair cross-section of the community, because there was only one Black or African–American in the jury venire.

At trial, petitioner moved to quash the jury array, noting that there was only one African–American juror out of sixty five jurors in the array. (T. 03/14/95, pp. 229–230). A hearing was conducted, in which it was established that African–Americans make up twelve percent of the population in Calhoun County, Michigan. (*Id.* at pp. 251–252). The county jury coordinator, David Hess, testified that if a prospective juror fails to return the jury questionnaire, another one is sent to that person. However, if a second questionnaire is not returned, there is no further action taken. Hess testified that approximately ten percent of the questionnaires are never returned. No records were kept as to the race of those prospective jurors or the prospective jurors excused from jury duty. (*Id.* at p. 239, 244). Petitioner's motion for another jury was denied.

In denying this claim, the Michigan Court of Appeals found that the procedure used to obtain potential jurors did not take race into consideration, and further found that petitioner had offered no evidence that any other jury venires were disproportionate. The Court of Appeals concluded that petitioner's "bald assertion" that systematic exclusion occurred was insufficient to support his challenge. *People v. Johnson*, Slip. Op. at * 2–3.

■■■ Although a defendant has no right to a *petit* jury composed in whole or in part of persons of his or her own race, he or she does have the right to be tried by a jury whose members are selected by indiscriminatory criteria. *Powers v. Ohio*, 499 U.S. 400, 404, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)(internal citations omitted). While states may prescribe relevant qualifications for their jurors, members of a community may not be excluded from jury service on account of their race. *Id.*; *Swain v. Alabama*, 380 U.S. 202, 203–204, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *overruled on other grds by Batson v. Kentucky*, 476 U.S. 79, 82, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

■■■ A defendant, however, may not challenge the makeup of a jury merely

because no members of his or her race are on a jury, but must prove that his or her race has been systematically excluded. *Apodaca v. Oregon,* 406 U.S. 404, 413, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *See also United States v. Mack,* 159 F.3d 208, 219 (6th Cir.1998)(criminal defendant has no affirmative right to a jury with a particular racial composition). In order to establish a prima facie violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to have been excluded is a 'distinctive group' in the community;
>
> (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that the under-representation is due to the systematic exclusion of the group in the jury selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

 "More than mere numbers must be provided to establish that African–Americans are systematically under-represented in the [jury] *venire.*" *United States v. Greene,* 971 F.Supp. 1117, 1128 (E.D.Mich.1997)(Rosen, J.). The strength of the evidence of under-representation of the group in the venire is only one factor to be considered in determining whether a prima facie violation of the fair cross-section requirement has been established. Factors such as the nature of the process by which jury lists are composed and the length of time of under-representation, together with the strength of the evidence that purports to establish unfair and un-reasonable representation also need to be examined. *Id.,citing to Ford v. Seabold,* 841 F.2d 677 (6th Cir.1988).

 The main evidence that petitioner has presented to establish that African–Americans are systematically excluded from jury service is that only one African–American was a member of his jury venire. "[A] one time example of under-representation of a distinctive group wholly fails to meet the systematic exclusion element" to establish a prima facie violation of the Sixth Amendment's requirement that jurors in criminal cases be drawn from a fair cross-section of the community. *McGinnis v. Johnson,* 181 F.3d 686, 690 (5th Cir.1999). "[S]tatistics concerning only one actual jury venire and one pool of summoned jurors is patently insufficient evidence to establish systematic under-representation." *United States v. Greene,* 971 F.Supp. at 1128.

 Petitioner, however, also contends that the jury selection process itself led to the under-representation of African–Americans on his jury, because the jury coordinator did not follow up on those juror questionnaires that were not returned. Petitioner, however, has offered no evidence concerning the race of the persons who failed to respond to the jury questionnaires, nor has he introduced any proof from which it could be inferred that such persons were likely to be African–Americans. Thus, petitioner has failed to establish a *prima facie* case of intentional racial discrimination in the jury selection process. *Hirst v. Gertzen,* 676 F.2d 1252, 1260 (9th Cir.1982); *See also United States v. Daly,* 573 F.Supp. 788, 793 (N.D.Tex.1983)(defendant failed to show that the failure to follow up on juror questionnaires had any impact on the randomness of the jury selection process); *United States v. Rioux,* 97 F.3d 648, 658 (2nd Cir.1996)(fact that a number of juror questionnaires were undeliverable did not show exclusion of Blacks or Hispanics from jury service, where there was no evidence that

any of the undeliverable questionnaires had been addressed to a Black or Hispanic person). Because petitioner has offered no proof that the unreturned questionnaires were sent to African–Americans, he has offered no proof of systematic exclusion on the part of the Calhoun County Circuit Court.

Because the only evidence that petitioner has offered to show systematic exclusion of jurors is the absence of more African–Americans from his panel, he had failed to establish that Calhoun County systematically excludes African–Americans from jury service. Because petitioner is not entitled to a jury containing members of his race, *Swain*, 380 U.S. at 203–204, 85 S.Ct. 824, petitioner has failed to show that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court. Petitioner has failed to state a claim upon which relief can be granted.

III. Petitioner was denied a fair trial by the prosecutor's failure to produce an endorsed witness who could have answered the jury's questions.

■ Petitioner's next claim involves the prosecutor's failure to produce Robert Cilwa, a firearms expert who had been endorsed by the prosecution prior to trial. On the fifth day of trial, the prosecutor indicated that Mr. Cilwa was not present to testify. Petitioner requested his production and a due diligence hearing was conducted. John Kostyo, a witness coordinator for the prosecutor's office, testified that he was not aware that the witness had been endorsed and needed to be produced until the beginning of the trial on March 14, 1995, even though the witness had been endorsed on March 8, 1995. It was determined that Cilwa had retired and was vacationing in Hawaii. (T. 03/20/95, pp. 8–12).

At the conclusion of the hearing, the prosecutor indicated that he had only proposed to call Cilwa simply for his analysis of the casings and bullets. The prosecutor noted that the trial court had already given defense counsel funds to consult his own expert witness, so there was no harm in Cilwa's nonproduction. (*Id.* at p. 14). Defense counsel argued that the prosecution had not shown due diligence in locating and subpoenaing Cilwa. (*Id.* at pp. 14–17).

In response to the trial court's inquiry, the prosecutor indicated that Cilwa's report showed that he analyzed shell casings found in the drive or street in front of Blenken Court, as well as samples of the bullets recovered from the victim. Cilwa analyzed the fired bullets and determined that they were a 7.62 × 39 Russian caliber bullet. Cilwa also analyzed the rifling characteristics. Due to the damage in the bullets, Cilwa could not positively identify the bullets with each other. Also, without having the rifle, Cilwa indicated that he could not exclude any weapon as being the one used in the shooting. Cilwa analyzed the fired cartridges and said that they exhibited the same class characteristics, but lacked significant matching to be positively identified with one another. Cilwa indicated that without the firearm, all he could say is that the bullets, although damaged, were consistent with one another. Cilwa could not say whether they were fired from the same gun. (*Id.* at p. 20–21). Defense counsel responded that Cilwa's testimony to the number of guns could be potentially exculpatory, but further argued that Cilwa could testify as to the patterns on the shell ejections, which too could be exculpatory. Counsel also indicated that where the casings were found would be consistent with whether the persons remained in one spot or moved about. (*Id.* at p. 21). The Court denied the defense

motion, indicating that it did not think that Cilwa's testimony would be sufficiently exculpatory to order his production, although the Court indicated it would increase the sum for defense counsel to obtain his own expert witness. (*Id.* at p. 22).

 Violations of state law and procedure which do not infringe specific federal constitutional protections are not cognizable claims under Section 2254. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Federal courts, "[d]o not act as an additional state appellate court to review a state court's interpretation of its own law and procedure." *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir.1987).

 Federal law does not require the production of *res gestae* witnesses. "[U]nder federal law, there is no obligation on the part of the prosecutor to call any particular witness unless the government has reason to believe that the testimony would exculpate the petitioner." *Atkins v. Foltz*, 856 F.2d 192, 1988 WL 87710, * 2 ( 6th Cir. August 24, 1988); *cert. den.* 488 U.S. 1046, 109 S.Ct. 877, 102 L.Ed.2d 1000 (1989)(citing to *United States v. Bryant*, 461 F.2d 912, 916 (6th Cir.1972)).

In the present case, there is no indication that Cilwa's testimony would have exculpated petitioner from the crime. Cilwa was unable to state whether the bullets had been fired from the same gun, but his report did not definitively state that the bullets had been fired from multiple weapons. Moreover, there was no evidence presented that any shots had been fired at petitioner from the victim. Indeed, petitioner himself admitted that no shots had been fired at him. Petitioner is not entitled to habeas relief on a claim that the prosecutor failed to call res gestae witnesses in compliance with M.C.L.A. 767.40a; M.S.A. 28.980(1), because issues of state law are not cognizable in federal habeas review, and the circumstances of this case do not reflect that petitioner was denied fundamental fairness. *Smith v. Elo*, 198 F.3d 247, 1999 WL 1045877, * 2 (6th Cir. November 8, 1999).

IV. The trial court erred in allowing the bloodied clothing of the deceased to be introduced into evidence when the clothing had little probative value and had a high likelihood of inflaming the passions and prejudices of the jury.

 Petitioner next claims that the trial court erred in admitting into evidence the victim's bloody clothing, claiming that this evidence was more prejudicial than probative. The Michigan Court of Appeals ruled that the clothing, which showed bullet holes, was relevant to show premeditation and deliberation and to negate petitioner's self-defense claim. *People v. Johnson*, Slip. Op. at * 3.

 "Habeas review does not encompass state court rulings on the admission of evidence unless there is a [federal] constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.1994), citing to *Fuson v. Jago*, 773 F.2d 55, 59 (6th Cir.1985); *cert. den.* 478 U.S. 1020, 106 S.Ct. 3334, 92 L.Ed.2d 739 (1986). Only where the erroneous application of state law deprives a petitioner of a fundamental constitutional guarantee will a federal court inquire into the state court rulings. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Fuson v. Jago*, 773 F.2d at 59. "[E]rrors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case so as to deny the defendant the fundamental right to a fair trial." *Welch v. Burke*, 49 F.Supp.2d 992, 1001 (E.D.Mich.1999)(Cleland, J.), *quoting Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.

1994); *cert. den.* 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994). "Appraisals of the probative and prejudicial value of evidence are entrusted to the sound discretion of the state trial court judge, and a federal court considering a habeas petition must not disturb the appraisal absent an error of a constitutional dimension". *See United States ex. rel. Gonzalez v. DeTella,* 918 F.Supp. 1214, 1220 (N.D.Ill.1996); *aff'd* 127 F.3d 619 (7th Cir.1997); *cert. den.* 523 U.S. 1032, 118 S.Ct. 1325, 140 L.Ed.2d 487 (1998).

 In the present case, admission of the murder victim's bloody clothing does not warrant habeas relief, in view of the Michigan Court of Appeals' upholding the admission of the clothing on the ground that the clothing was relevant to show the position of the bullet holes. *Jackson v. Shanks,* 143 F.3d 1313, 1322 (10th Cir. 1998). Habeas relief will be denied where the admission of the blood stained clothing that the victim was wearing when he was shot did not deprive petitioner of a fundamentally fair trial. *See Todd v. Stegall,* 2000 WL 654960, * 14 (E.D.Mich. April 24, 2000)(Cohn, J.). Accordingly, petitioner is not entitled to habeas relief on this claim.

V. The prosecutor denied petitioner a fair trial by misstating the law and arguing that the petitioner had a duty to retreat in his own home.

 Petitioner next claims that the prosecutor engaged in misconduct by suggesting, both during cross-examination of petitioner and in closing argument, that petitioner had a duty to retreat before he could shoot the victim in self-defense. Petitioner contends that this deprived him of a fair trial, because under Michigan law, there is no duty to retreat when a person is in his or her own home.

 When a petitioner seeking habeas relief makes a claim of prosecutorial misconduct, the reviewing court must consider that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor. On habeas review, a court's role is, "to determine whether the conduct was 'so egregious as to render the entire trial fundamentally unfair.'" *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355–1356 (6th Cir.1993); *cert. den.* 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 666 (1994), *quoting Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir. 1979); *cert. den.* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979). Because this case is a habeas case and is not a direct appeal, the inquiry into this issue is less stringent. *Spalla v. Foltz,* 615 F.Supp. at 227.

 When analyzing a claim of prosecutorial misconduct, a court must initially decide whether the challenged statements were improper. *Boyle v. Million,* 201 F.3d 711, 717 (6th Cir.2000). If the conduct were improper, the district court must then examine whether the statements or remarks are so flagrant as to constitute a denial of due process and warrant granting a writ. *Id.* In evaluating prosecutorial misconduct in a habeas case, consideration should be given to the degree to which the challenged remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury, and, except in the sentencing phase of a capital murder case, the strength of the competent proof against the accused. *Serra,* 4 F.3d at 1355–1356.

 Under Michigan law, before using deadly force in self-defense, a person has a duty to retreat if it is safely possible to do so. *See People v. Mroue,* 111 Mich.App. 759, 765, 315 N.W.2d 192 (1981). Howev-

er, there is no duty to retreat if the person is in his or her own home. *Id.*

In rejecting this claim, the Michigan Court of Appeals noted that there was conflicting evidence over whether petitioner resided at this residence and concluded that the prosecutor's argument was premised on the assertion, supported by the evidence, that petitioner did not live at the house where the shooting took place. *People v. Johnson,* Slip. Op. at * 3.

■ · A prosecutor has " 'broad latitude in the inferences it may reasonably suggest to the jury during summation.' " *United States v. Rahman,* 189 F.3d 88, 140 (2nd Cir.1999); *cert. den.* 528 U.S. 1094, 120 S.Ct. 830, 145 L.Ed.2d 698 (2000), *quoting United States v. Casamento,* 887 F.2d 1141 (2nd Cir.1989); *cert. den.* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). In the present case, there was conflicting evidence over whether petitioner actually lived at 25 Blenken Court. James Dickerson insisted that petitioner did not live at this house, although he conceded on cross-examination that petitioner occasionally spent nights at the house. Petitioner himself admitted that he gave another address to the police when questioned by them, although he insisted that this was only a mailing address. The prosecutor's questions and comments about petitioner having a duty to retreat would not entitle petitioner to habeas relief, because the jury was free to accept or reject the inference that petitioner did not live at the house and would therefore have a duty to retreat based upon all the evidence. *See Howard v. Garvin,* 844 F.Supp. 173, 176 (S.D.N.Y.1994).

Moreover, as petitioner concedes, the trial court instructed the jury that if a person is assaulted in their own home, the person would have no duty to try to retreat and get away. (T. 03/21/95, p. 122). Even if the prosecutor's comments about

petitioner having a duty to retreat under Michigan law were improper, petitioner cannot show that he was prejudiced by these remarks, where the state trial court properly instructed the jury with regard to the law of self-defense in Michigan, including the fact that petitioner had no duty to retreat in his own home. *See United States ex. rel. Boyce v. Dobucki,* 993 F.Supp. 652, 657–658 (N.D.Ill.1998).

■■ Lastly, in light of the evidence indicating that excessive force was used by petitioner, petitioner is unable to show that he was prejudiced by petitioner's questions and comments. Even if petitioner had no duty to retreat before using force to repel an attack, under Michigan law, the force used would have to be proportionate to the threat. In killing another in self-defense, defendant is not entitled to use any more force than is necessary to defend himself. *People v. Kemp,* 202 Mich.App. 318, 322, 508 N.W.2d 184 (1993). In light of the fact that the evidence established that petitioner fired twenty six shots at the victim, as he was retreating in his car, the Court concludes that any improper remarks about petitioner having a duty to retreat did not have a substantial and injurious effect or influence on the jury's decision. Petitioner's fifth claim does not entitle him to relief.

VI. Petitioner was denied a fair trial by the trial court's refusal to give his requested instruction on imperfect self-defense.

■ Petitioner next claims that the trial court erred in declining to give the jury an imperfect self-defense instruction, which would permit them to find petitioner guilty of the lesser offense of involuntary manslaughter, under a theory that petitioner acted in self-defense, but used excessive force and acted in a grossly negligent manner. Although the trial court agreed to instruct the jury on the lesser

offense of involuntary manslaughter, the trial court indicated that excessive force is not an element of the offense of involuntary manslaughter. (T. 03/21/95, pp. 19–22).

On appeal, the Michigan Court of Appeals rejected petitioner's claim, noting first that the doctrine of imperfect self-defense does not apply when a defendant uses excessive force. The Court of Appeals further noted that imperfect self-defense would mitigate a murder charge to voluntary manslaughter, not involuntary manslaughter. *People v. Johnson,* Slip. Op. at *4.[1]

 "While a defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him...the failure to give such an instruction will not alone mandate the issuance of a writ of habeas corpus." *Sanders v. Israel,* 717 F.2d 422, 425 (7th Cir.1983)(internal citations omitted); *cert. den.* 465 U.S. 1033, 104 S.Ct. 1302, 79 L.Ed.2d 701 (1984). The omission of the instruction must so infect the trial that the resulting conviction violates due process. *Id.* When the issue before the habeas court is the omission of an instruction, a habeas petitioner's burden is especially heavy. *See United States ex. rel. Kirk v. Washington,* 932 F.Supp. 1053, 1056 (N.D.Ill. 1996). A conviction will not be overturned even on direct appeal for refusal to give a requested jury charge unless that instruction represents a theory of the defense with a basis in the record that would lead to an acquittal. *United States v. Bok,* 156 F.3d 157, 163 (2nd Cir.1998). Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient in comparison to a model state instruction.

*Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

 This Court notes first that the Michigan Supreme Court has yet to recognize the doctrine of imperfect self-defense as a defense. *See People v. Posey,* 459 Mich. 960, 590 N.W.2d 577 (1999). The Michigan Court of Appeals, on the other hand, has recognized imperfect self-defense as a qualified defense that can mitigate a murder charge to voluntary manslaughter. This defense is available where the defendant would have been entitled to evoke the theory of self-defense had he or she not been the initial aggressor. *People v. Kemp,* 202 Mich.App. at 323, 508 N.W.2d 184. However, a defendant is not entitled to invoke the doctrine of imperfect self-defense if he or she initiated the confrontation between the victim and himself or herself with the intent to kill or do great bodily harm, even if, at the time he or she shot the victim, the defendant honestly and reasonably believed that his or her life was in danger. *Id.* at 324, 508 N.W.2d 184. The imperfect self-defense theory is unavailable where the defendant makes a decision to kill the victim without being in a position where it was immediately necessary. *People v. Butler,* 193 Mich.App. 63, 67, 483 N.W.2d 430 (1992); *lv. den.* 440 Mich. 881, 487 N.W.2d 458 (1992). Lastly, and most importantly, imperfect self-defense is not available if the defendant responded to the victim's aggression with excessive force. *People v. Kemp,* 202 Mich.App. at 325, 508 N.W.2d 184 (1992); *See also Whalen v. Trippett,* 225 F.3d 660, 2000 WL 977342, * 3 (6th Cir. July 7, 2000) (2000).

In the present case, petitioner sought to invoke the imperfect self-defense doctrine

---

1. The jury in this case was instructed to consider the offenses of first and second degree murder, voluntary manslaughter, and involuntary manslaughter. (T. 03/21/95, pp. 112–117).

under the theory that he used excessive force in acting in self-defense. Michigan law does not permit the use of the imperfect self-defense doctrine when a defendant uses excessive force. In this case, there was evidence that petitioner used excessive force in repelling the victim's aggression, when he fired twenty six bullets at the victim as he was retreating in his car from the house. Because the facts suggest that petitioner acted with excessive force in repelling the victim's aggression, he was not entitled to an instruction on the imperfect self-defense doctrine and would not be entitled to the issuance of a writ of habeas corpus on that basis. *See Smith v. Stegall,* 2000 WL 1923510, * 6 (E.D.Mich. December 13, 2000)(Hood, J.).

VII. The trial court denied petitioner his closing argument by adding an instruction to the original jury charge after both counsel had completed their closing arguments.

█ Petitioner next claims that the trial court deprived him of the right to present a closing argument when the trial court gave additional instructions to the jury after defense counsel and the prosecutor had completed their closing arguments. Prior to closing arguments, the trial court reviewed the instructions and requests for instructions with both counsel. Following arguments, the trial court informed counsel that he left out the instruction on inferring intent. (T. 03/21/95, p. 92). Defense counsel objected to the inclusion of this instruction, noting that it was not included in the court's earlier review of instructions and claimed that his argument would have been different had he known prior to the commencement of arguments that such an instruction would be given. Defense counsel also rejected the prosecutor's suggestion that the appropriate remedy would be to permit defense counsel to re-open his closing argument, because to do so would put an undue emphasis on this

area of instructions. (*Id.* at pp. 92–93). Over counsel's objections, this instruction was given to the jury. (*Id.* at p. 118).

The Michigan Court of Appeals rejected this claim, finding that in light of the importance of this instruction and the fact that petitioner was given an opportunity to reargue, petitioner had failed to demonstrate how he was prejudiced or how his argument would have been different had he known that the inferred intent instruction would be given. *People v. Johnson,* Slip. Op. at * 5.

In the present case, any error in giving post-argument instructions was harmless, where the additional instruction was an accurate statement of the law and petitioner did not indicate how he would have changed his closing argument if he had been permitted to argue only after knowing that this instruction would be given. *See United States v. Tipton,* 90 F.3d 861, 886–887 (4th Cir.1996); *cert. den.* 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997). Moreover, because defense counsel did not request an opportunity to supplement his closing argument after being aware that this instruction would be given, he cannot argue that he was shortchanged the opportunity to argue any issues arising out of this added instruction. *See United States v. Manges,* 110 F.3d 1162, 1177–1178 (5th Cir.1997); *cert. den.* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998). Petitioner is not entitled to habeas relief on this claim.

VIII. Petitioner was denied his right to effective assistance of counsel at trial; petitioner is also entitled to a new trial based on newly discovered evidence.

Petitioner lastly raises several different issues in his final claim for relief. Petitioner first claims that he is entitled to a new trial based upon newly discovered evidence that would prove his innocence. Petitioner also claims that he was deprived of the effective assistance of counsel.

### A. The newly discovered evidence claim.

Petitioner first contends that he is entitled to a new trial based upon the affidavit of Steven Armstrong.[2] In the affidavit, which was also presented to the state courts, Mr. Armstrong indicated that the AK 47 rifle that Keith Cork had in his possession was an automatic rifle. Armstrong stated that he knew the weapon was automatic, because he had test fired the weapon. The Michigan Court of Appeals rejected this as newly discovered evidence, finding that it would merely have been cumulative or impeachment evidence. *People v. Johnson*, Slip. Op. at * 5.

Federal courts that have suggested that habeas relief could be granted upon newly discovered evidence have set an extraordinary showing of petitioner's innocence before habeas relief could be granted. In *White v. Keane*, 51 F.Supp.2d 495, 502–503 (S.D.N.Y.1999), the federal court indicated that in order for newly discovered evidence to warrant habeas relief, the evidence must be "so compelling" that it would violate the fundamental fairness embodied in the Due Process clause not to afford the petitioner a new trial where the new evidence could be considered. *See also Alleyn v. Warden*, 878 F.Supp. 30, 31 (M.D.Pa.1995)(in order to be granted habeas relief on an allegation of newly discovered evidence, the petitioner must make at least a "truly persuasive demonstration of innocence").

In the present case, Armstrong's proposed testimony was not so compelling that the failure to grant petitioner a new trial on the basis of this new evidence would violate due process. Petitioner wanted to present this evidence that the firearm was automatic to support his claim that he only fired the weapon once, but that because the rifle was automatic, twenty six rounds went off. Armstrong's evidence was cumulative of other evidence already presented to that effect. Petitioner's counsel elicited an admission from Keith Cork that he had testified at the preliminary examination that the rifle was an automatic weapon. Cork, in fact, admitted that he had seen Steven Armstrong shoot the rifle, and it fired one shot right after another. ( T. 03/15/95, p. 94). Several of the witnesses indicated that they heard the shots go off in rapid succession. Thus, Armstrong's testimony would merely have been cumulative to the evidence already presented at trial and would only have been offered to impeach the testimony of those witnesses who claimed that the rifle was semi-automatic. New evidence which is merely cumulative or impeaching is not an adequate basis for a new trial. *Mesarosh v. United States*, 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). "[T]he mere existence of impeaching evidence does not warrant a new trial." *United States v. Davis*, 15 F.3d 526, 532 (6th Cir.1994); *See also Clark v. Irvin*, 844 F.Supp. 899, 907 (N.D.N.Y.1994). Moreover, the statements in this affidavit were not "newly discovered evidence," as required to support habeas petitioner's claim of actual innocence, where petitioner presented the substance of this affidavit at his trial. *Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir.2000); *cert. den.* —— U.S. ——, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001). Petitioner would therefore not be entitled to habeas relief on this part of his claim.

### B. The ineffective assistance of counsel claims.

#### 1. *Standard of Review.*

To show that he was denied the effective assistance of counsel under

---

**2.** Attached to the petition as Appendix A.

federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.; O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir.1994). In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

### 2. *The individual claims*

A. Failure to call Steven Armstrong as a witness.

■ Petitioner first alleges that counsel was ineffective for failing to call Steven Armstrong as a witness to testify that the rifle was an automatic weapon. However, as mentioned above, counsel elicited an admission from Keith Cork that he had previously testified that the weapon was automatic and had seen Armstrong shoot the weapon with the shots going off right after the other. Other witnesses who were inside the house on Blenken Court at the time of the murder described the shots as having gone off in rapid succession. The alleged ineffectiveness of counsel in failing to call Armstrong to testify was not

prejudicial where his testimony would have been merely cumulative to Cork's testimony and would have had less than a marginal effect required to establish reasonable doubt as to petitioner's guilt. *See Ashker v. Class*, 152 F.3d 863, 874 (8th Cir.1998).

B. Failure to object to the prosecutor's misstatements of the law.

■ Petitioner next claims that counsel was ineffective for failing to object to the prosecutor's misstatements concerning his duty to retreat prior to using deadly force in self-defense. Trial counsel's failure to object to the comments made by the prosecutor that petitioner had a duty to retreat was not ineffective assistance of counsel, when the reference to such a duty was not a major theme of the prosecutor's argument, especially where the trial court instructed the jury that the arguments were not to be considered as evidence (T. 03/21/95, p. 123), and also gave the jury the correct instruction on the duty to retreat. (*Id.* at p. 122). *See Wilson v. McMacken*, 786 F.2d 216, 219 (6th Cir.1986).

C. Failure to adequately impeach the prosecution witnesses.

■ Petitioner next alleges that counsel failed to adequately cross-examine James Dickerson about changing his story about whether the victim had a hand gun in his hand at the time of the shooting, as well as failing to impeach Keith Cork about changing his story about the AK–47 being an automatic weapon. Petitioner also contends that trial counsel failed to impeach Cork with his prior Carrying a Concealed Weapons (CCW) conviction.

■ Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available. *Gallo v. Kernan*, 933 F.Supp. 878, 881 (N.D.Cal.1996); *aff'd* 141

608

F.3d 1175 (9th Cir.1998); *cert. den.* 525 U.S. 856, 119 S.Ct. 137, 142 L.Ed.2d 111 (1998).

The Court first notes that trial counsel impeached James Dickerson with the statement he made to the police about seeing a handgun in the victim's possession and argued this fact to the jury. (T. 03/16/95, pp. 254–255, 258; T. 03/21/95, p. 66). Counsel also impeached Keith Cork with the fact that he had previously testified that the rifle was an automatic weapon. (T. 03/15/95, p. 88). Cork, in fact, admitted that he had seen Steven Armstrong shoot the rifle, and it fired one shot right after another. (*Id.* at p. 94).

 "Where, as here, trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim." *Rich v. Curtis,* 2000 WL 1772628, * 5 (E.D.Mich. October 24, 2000)(Friedman, J.)(citing to *Cardwell v. Netherland,* 971 F.Supp. 997, 1019 (E.D.Va.1997); *aff'd* 152 F.3d 331 (4th Cir. 1998); *cert. den.* 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998)). Because counsel effectively impeached Dickerson and Cork with their inconsistent statements, petitioner is unable to show that counsel's performance was deficient.

As to petitioner's related claim that trial counsel was defective for failing to impeach Cork with his prior CCW conviction, under Michigan law, "prior convictions for nontheft crimes which do not contain elements of dishonesty or false statement should never be admitted into evidence" for impeachment purposes. *People v. Allen,* 429 Mich. 558, 596, 420 N.W.2d 499 (1988). Cork's prior concealed weapons convictions would not be admissible for impeachment purposes. *Id.* at p.

610, 420 N.W.2d 499. Because counsel would have been unable to use this prior conviction to impeach Cork's credibility, petitioner is unable to establish that counsel was ineffective for failing to do so.

*3. Conclusion*

Petitioner has failed to establish that he was deprived of the effective assistance of counsel.

**IV. *ORDER***

Based upon the foregoing, IT IS ORDERED that David L. Johnson's Petition for a Writ of Habeas Corpus **IS HEREBY DISMISSED WITH PREJUDICE.** Judgment shall be entered accordingly.